Per Curiam :
This case was referred to Trial Commissioner Herbert N. Maletz with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in a report and opinion filed on May 10, 1967. Defendant has filed no exceptions to or brief on this report and the time for so filing pursuant to the Rules of the court has expired. On June 1, 1967, plaintiff filed a tentative notice of intention to except to the commissioner’s find *1223 ings of fact and proposed conclusions of law in which, it was provided that if the defendant did not file any exceptions the plaintiff did not intend to file any exceptions. Since the court agrees with the commissioner’s findings, opinion and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same with minor modifications as the basis for its judgment in this case without oral argument. Plaintiff is, therefore, entitled to recover and judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Rule 47(c).
OPINION OF COMMISSIONER*
Maletz, Oommissioner:
This is an estate tax refund suit. Decedent, Mabel Lloyd Ridgely, a resident of Dover, Kent County, Delaware, died testate on January 11, 1962, and an estate tax return was filed in October 1962 containing an election to have the property forming her gross estate valued as of the date of death. Among the items reported in the return were (1) a 368-acre farm known as Eden Hill Farm, in Kent County, Delaware, near Dover, Delaware, which was valued at $137,100 (or about $372.00 per acre), and (2) 510 shares of capital stock of Farmers Bank of Delaware which were valued at $106.00 per share for a total of $54,060. Also shown on the return but not includible in the taxable estate was an ocean-front lot with a summer cottage thereon in Rehoboth Beach, Delaware, which the decedent had given to her grandson and his wife by deeds executed in 1959, 1960, and 1961. Subsequent to filing the return, the plaintiff-estate informed the Internal Revenue Service that the Eden Hill Farm consisted of 393.1 acres rather than the 368 acres originally reported.
Thereafter, the Internal Revenue Service determined that the value of the Eden Hill Farm was $1,061,370, or $2,700 per acre; that the value of the Farmers Bank stock was $115.00 per share, or a total of $58,650; and that the Rehoboth Cottage was includible in decedent’s gross estate as a gift in contemplation of death.[1] Plaintiff paid deficiencies in the estate *1224 tax and interest attributable to these adjustments and filed timely elaims for refund which were disallowed. The present suit followed.
The problem is thus threefold — to determine (1) the fair market value of the Eden Hill Farm as of January 11,1962, the date of the decedent’s death; (2) whether the decedent’s transfers of her interest in the Rehoboth Cottage and lot were gifts in contemplation of death; and (3) the fair market Value as of January 11, 1962 of 510 shares of the Farmers Bank stock.
PAIR MARKET VALUE OP EDEN HILL PARM
Eden Hill Farm was a grain farm situated in Kent County, Delaware, adjacent to but outside the city limits of Dover, the State Capital of Delaware, which had a population at the time of decedent’s death of about 7,250. The farm was bounded on the east by the tracks of the Pennsylvania Railroad which ran in a north-south direction and separated the farm from the City of Dover; on the north, by Hazlettville Road which marked the Dover city line; on the west, by another farm; and on the south, by a stream that bordered on other farm land.
Eden Hill Farm had been owned by the decedent, her deceased husband and the ancestors of her deceased husband since 1749 and had during all of such period been used solely for farm purposes. Fifty-five acres of the farm were woodland, and the balance (338 acres) consisted of tillable land and areas covered by farm-type buildings.
Hazlettville Road (the northern boundary of the farm) was not one of the main traffic arteries entering or leaving the City of Dover. It was a black-top road not leading to any town of any importance. The traffic on the road was sparse, consisting of approximately 25 per cent horse and wagon traffic and 75 per cent automobile traffic.
The area opposite Eden Hill Farm, across Hazlettville Road, was approximately 50 per cent vacant land and 50 per cent developed mainly with unattractive substandard single-family houses. Some 15 acres of the vacant land in the area had been purchased by the City of Dover Housing Authority in November 1961 for use as a low-cost housing project. *1225 About 800 feet north of the substandard single-family area was a comparatively new residential development — Lincoln Park — consisting of 60 building lots on which construction had started prior to 1960. At the time of the decedent’s death the Lincoln Park project was only half built, having come to a virtual standstill because of financial problems. No construction permits for the project were issued in 1960, 1961 and 1962.
Adjacent to the eastern boundary of the Eden Hill Farm, across from the railroad tracks to the east, were two new residential developments; some vacant land reserved for park purposes; and older single-family residences. These areas were separated from the Eden Hill Farm by the railroad tracks and no grade crossings, overpasses or underpasses connected such areas with the farm.
The northeast comer of the Eden Hill Farm was about eight blocks from the center of the downtown Dover business area, the approach being through an area of unattractive, substandard buildings. The immediate approach to the farm from the City of Dover was over a single, steep grade crossing at the intersection of Hazlettville Road and the railroad tracks. There were no other grade crossings, overpasses or underpasses furnishing direct access to the farm from the Dover area.
The grade crossing of Hazlettville Road and the railroad tracks lay at the northeast comer of the farm. In the immediate vicinity of the crossing were coal bins, a highway transfer warehouse, fuel tanks, truck parking facilities and cold storage buildings.
The Eden Hill Farm, as of the date of decedent’s death, was not subject to any zoning or building restrictions since it was outside the city limits of Dover, and Kent County had no zoning ordinance. As of that date, the farm lacked public utility sewage and water services necessary for industrial or residential purposes. The farm was in the franchise area for the City of Dover’s municipal power plant and was served' by a city electricity line. Construction of a new municipal power plant was under way, but even upon its completion, the electrical power facilities available to the farm were inadequate for a major industrial plant.
*1226 The great bulk of residential, commercial and industrial development in the Dover area has been to the east of the Pennsylvania Eailroad tracks — rather than to the west where Eden Hill Farm was situated, the railroad tracks having, in general, acted as a barrier to development west of the tracks. Thus, during the period preceding January 11,1962, most of the new commercial development in the Dover area was on the east side of the City of Dover along the main north-south roadway, i.e., Eoute 13. The older residential and commercial development in the Dover area had been similarly concentrated east of the railroad tracks. There was no north-south thoroughfare in the Dover area west of the railroad tracks.
Industrial development in the Dover area has been slow and sporadic and has occurred only after long intervals. The principal manufacturing and industrial plants as of the date of the decedent’s death were: (1) the Eichardson & Eobbins plant at the east side of Dover; (2) three International Latex plants — consisting of a plant located at the east of Dover, a second plant north of the Eden Hill Farm along the west side of the railroad tracks, and a third plant to the east of and across the railroad tracks from the second plant; and (3) a small distribution plant of the Coty company along the west side of the railroad tracks.
The first plant established in Dover was that of Eichard-son & Eobbins which was built in 1880. It was not until 57 years later {i.e., 1937) that International Latex established its first plant in Dover, which was followed 17 years later (in 1954) by construction of a second plant.[2] And it was not until 14 years after International Latex established its first plant that Coty (in 1951) established its small distribution plant.
Manufacturing employment in Kent County (in which Dover is situated), during the period from 1952 to 1963, decreased from 5,384 to 4,255. The total population of the county experienced little increase from 1900 to 1950 — rising-in that period from 32,762 to 37,870. From 1950 to 1960 there was a substantial increase in the population of Kent County {i.e., from 37,870 to 65,651) which was largely attributable to the reactivation in 1952 of the Dover Air Force Base which is located about two miles southeast of the center of *1227 Dover. The increase in population attributable to the reactivation of the Air Force Base was of a kind which would stimulate service and professional 'businesses, but not industrial or manufacturing businesses. Further, the growth attributable to the reactivation of the Air Force Base would likely be to the east of the railroad tracks and to the east of Dover, rather than to the west of the railroad tracks where Eden Hill Farm was situated.
The period preceding the death of the decedent was one in which residential construction in the City of Dover had declined. In the same period there had been only sporadic issuance of building permits for construction of any consequence.
In the fall of 1961 and early 1962, prior to and shortly after the decedent’s death, decedent, and later her family, attempted to interest the Dover School Board in buying a 40-acre tract on the Eden Hill Farm for a proposed new school, and suggested a price of $8,000 per acre — an amount it understood the Board was willing to pay for a site. Later the family reduced the price to $2,000 per acre and subsequently to $1,000 per acre. The School Board was not interested, however, (1) because of the location of the site west of the railroad tracks which would require the children whom the school was intended to accommodate to cross the Hazlettville Road grade crossing, and (2) because of the dilapidated condition of the neighborhood and the type of buildings on the north side of Hazlettville Road. Eventually the Board purchased a site for the new school located east of the railroad tracks at a price of $5,000 to $6,000 an acre.
In November 1961 (as seen before), the Dover Housing Authority purchased 15 acres of vacant land directly across Hazlettville Road from the northeast boundary of the Eden Hill Farm for use as a low-cost housing project to relocate Negro families in an area proposed to be tom down for slum clearance. The tract was in the heart of the Negro district and was thus considered the only feasible place for location of the project in view of racial conditions as they existed in Dover in 1961. The price paid was $3,500 an acre— an amount which was higher than the fair market value. Apparently public relation considerations motivated the Housing Authority’s decision to pay the higher price rather than *1228 institute an eminent domain proceeding, particularly since only 15 acres were involved.
There were other sales of land west of the railroad tracks which occurred considerably before the decedent’s death. Thus, in 1951, the land for the Coty plant, west of the tracks, was purchased for $550.00 per acre; in 1954, the land for the new International Latex plant, also west of the railroad tracks, was purchased for $1,000 and $750.00 per acre. By January 11, 1962 (the date of the decedent’s death), the average going price for land in the Dover area for industrial use was $2,500 per acre.[3] As of that date, however, there was no indication that any prospective purchaser had plans of any kind to acquire all or any part of the Eden Hill Farm, or any other land in the Dover area, as a site for an industrial plant.
In February 1962 — nearly a month after the decedent’s death — the General Foods Corporation retained the Fantus Company to locate a site for a new plant for its Jell-0 Division. The Fantus Company then investigated possible sites for such a plant and in the latter part of April 1962 recommended several potential sites, including the Eden Hill Farm and sites in Baltimore, Maryland, and Philadelphia, Pennsylvania. In the latter part of April 1962 (over three months after the decedent’s death) the devisees of the Eden Hill Farm were first informed by a local realtor that a large but unnamed industry was possibly interested in acquiring 100 acres of the farm. After consulting with the realtor, the owners decided that the asking price would be $2,700 per acre. The officer of General Foods who was given the responsibility for establishing the new plant was given a budget for the plant and, as a part thereof, a budget for land acquisition costs.
By an option agreement dated May 11, 1962, General Foods, as an undisclosed principal acting through an agent, acquired an option to purchase approximately 112 acres of Eden Hill Farm as a site for a new plant. The option price *1229 was $2,700 per acre, that being the first price suggested by the owners. General Foods had no appraisal made of the property, nor did it conduct any price negotiation. For one thing, it considered $2,700 per acre reasonable in terms of the amount budgeted for land costs in connection with the establishment of its new plant, and reasonable in comparison with the per acre prices being asked for sites in the large urban areas which were being considered as alternative sites. Also to have the new plant in production was worth approximately $100,000 per week to General Foods. In addition, General Foods was of the view that any delay in proceeding with construction of the plant by virtue of negotiations with respect to the per acre price of the land might have thrown construction into the winter season with a consequent increase in construction costs of from $100,000 to $150,000.
General Foods preferred the Eden Hill Farm to other locations for. the following reasons: (1) the site was an attractive one on which site preparation and construction would not be as expensive as on certain other sites being considered; (2) the area had a relatively low wage rate; (3) the City of Dover appeared to want industry and General Foods thought the city would undertake to provide the essential services it needed at the Eden Hill Farm location; (4) the site was close to a main highway and close to a rail line; and (5) the price of $2,700 appeared reasonable in light of the prices at which alternative locations under consideration were being offered.
After inspecting the Eden Hill Farm in May 1962, representatives of General Foods determined that the 116 acres lying at the western side of the property were suitable for purchase as a location for its prospective new plant, but only if the following important conditions were first satisfied: (a) that there be an arrangement under which the City of Dover would permit Delaware Power & Light Company to enter the former’s franchised area and to furnish electrical service to the plant; (b) that the City of Dover, at its expense, greatly expand its sewage system and build a 15-inch sewer line over a mile long to the proposed plant site; (c) that the City of Dover, at its expense, increase the city’s water supply system and extend a 12-inch water main to the site of the plant; (d) that the proposed plant site and surrounding areas *1230 be annexed to the City of Dover [4] and be subject to a new zoning classification to be known as “Restricted Industrial Park Manufacturing Zone”; and (e) that there be an agreement with the City of Dover with respect to trash removal from the site of the contemplated plant.
In mid-May 1962 (over four months after the decedent’s death), there was the first public announcement to the effect that General Foods was planning to locate a new plant in the Dover area. Four months later, on September 4, 1962, General Foods and the City of Dover finally reached an agreement (which was embodied in writing) with respect to the steps to be taken to fulfill the conditions General Foods insisted had to be met before it exercised its option to acquire the Eden Hill Farm site. The cost to the City of Dover attributable to the providing of water and sewerage requirements for General Foods, pursuant to its conditions, was in excess of $900,000.
Unless the recited conditions had been met, General Foods was not interested in purchasing any part of Eden Plill Farm at $2,700 per acre or at any other price. It was only after execution of the September 4,1962 agreement, which contained all the conditions required by General Foods, that General Foods exercised its option and acquired 116 acres, or approximately 30 per cent, of the Eden Hill Farm.
Since the date of the decedent’s death, with the exception of the offer which eventuated in General Foods’ acquisition of 116 acres of Eden Hill Farm, there have been no offers to purchase all or any part of the remainder of the Eden Hill Farm.
Section 20.2031-1 (b) of the Treasury Regulations (which is applicable to this case) provides that property includible in a decedent’s gross estate is to be included at its “fair market value at the time of the decedent’s death.” The section goes on to state that “[t]he fair market value is the price *1231 at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts.”
At the trial of the case, the only expert witness with respect to the valuation of Eden Hill Farm as of January 11, 1962, was Samuel C. Hanby who was called by plaintiff.[5] Mr. Hanby was a well-qualified expert on valuation of real property in the Dover area; in fact, he had, on a number of occasions, been employed by the defendant to give opinions and appraisals with respect to the valuation of real estate in the Dover area. It was his opinion that the highest and best use of the Eden Hill Farm as of January 11, 1962, was for agricultural purposes and not commercial, residential or industrial purposes. Having so determined, he expressed the opinion — based on a comparison with six farm properties that were sold in the Dover area between 1957 and 1962 — that the fair market value of the Eden Hill Farm, as of January 11, 1962, was $363.00 per acre, or a total of $143,000. Mr. Hanby’s appraisal of the fair market value of the Eden Hill Farm — based on his conclusion that its highest and best use was for agricultural purposes — reflects careful consideration of what he thought were significant differences between the Eden Hill Farm and the other farm properties. Several of the comparable properties were, it is true, located as much as *1232 414 miles from the center of Dover. Eor farm purposes, however, it would not seem that a property 4% miles from the center of a small town such as Dover would have a radically different value than a farm 1,1%, 2, 2%, 3 or 314 miles from the center of town. Moreover, Mr. Hanby’s testimony made clear that he had specifically taken the differences in distance into account in his appraisal.
There is, of course, no question that “[e] xpert opinion is only a guide to the court, where it is in accordance with the proven facts of record and where it bears indicia of reliability. It is only where expert opinion is supported by facts having strong probative weight, that the opinion testimony will in itself be given conclusive weight. Opinion evidence must be evaluated in accordance with the soundness and reality of the reasoning disclosed.” 10 Mertens, Law of Federal Income Taxation (Rev. ed.) § 59.03, pp. 9-11. See also e.g., Head v. Hargrave, 105 U.S. 45, 49 (1881); The Conqueror, 166 U.S. 110, 131-133 (1897); Central Trust Co. v. United States, 158 Ct. Cl. 504, 514, 305 F. 2d 393, 399 (1962). In this connection not only is the underlying basis for Mr. Hanby’s testimony as to the fair market value of the Eden Hill Farm for agricultural purposes supported by the demonstrated facts of record, it was not refuted, contradicted or even called into serious question. His expert opinion in such circumstances may not be arbitrarily disregarded. Cullers v. Commissioner, 237 F. 2d 611, 616 (8th Cir. 1956) and cases cited. “It would seem that, if the valuation placed upon the real estate by the * * * [plaintiff] and * * * [its] witness was too low, the * * * [defendant] would have produced some qualified witness who would have said so. The lack of such evidence operates against the * * * [defendant’s] contentions.” Id. at 617. It is concluded that as of the date of the decedent’s death the fair market value of the Eden Hill Farm for agricultural purposes was — as Mr. Hanby testified — $143,000 (or $363.00 per acre).
Likewise supported by the record is the conclusion of this witness that as of the valuation date the Eden Hill Farm was not suitable for commercial or residential development. It was not suitable for commercial development because of its location west of the railroad tracks; the absence of a main thoroughfare passing the property; and the character of the *1233 surrounding area containing substandard slum housing. It was not suitable for residential development because the property was to the west of the tracks and the direct approach to it from the center of Dover was over a single, steep grade crossing; the cost of constructing a railroad overpass or underpass interconnecting the property with the residential areas to the east of the tracks would be prohibitive; the surrounding housing area was substandard; and the growth of residential areas in Dover and vicinity was to the east of the railroad tracks.
This brings us to the question as to whether, as of the date of the decedent’s death, the Eden Hill Farm had an industrial potential. Mr. Hanby testified in this connection that he had considered the possible industrial use of the property and had concluded, based on a study of the frequency with which industries had come into Dover in the past, that the property might be expected to be purchased for industrial use in four segments of approximately 100 acres each at 17-year intervals. In arriving at this 17-year interval, Mr. Hanby started in 1856, when the Pennsylvania Railroad was built in Dover, and considered the Richardson & Robbins plant in 1880, the first International Latex plant in 1937, the Coty plant in 1951, and the new International Latex plant in 1954. He further considered that since it had been some time since a new industry had located in Dover (the new International Latex plant was built in 1954), it was more likely than not that as of January 1962 the first industry to come into Dover might not be the full 17 years away, but rather only four or five ye'ars away. Based on this analysis, together with a price for land for industrial use of $2,500 per acre and an interest rate of six per cent, he concluded that sales of the property 5,22,39, and 56 years in the future when discounted to present values by use of annuity tables would result in a present value as of January 1962 of approximately $300,000 for the property as a potential industrial site. Mr. Hanby further considered that because there were other industrial tracts available in Dover, particularly in the northwest section near the new municipal power plant, there was only a 50 per cent chance that industry would purchase the Eden Hill Farm if it located in the Dover area in the future. He, therefore, concluded that someone purchasing the Eden *1234 Hill Farm for its industrial potential would pay about $150,000 for it, or nearly the same amount that someone would pay for the property as a farm. He went on to state, however, that while he had very seriously considered the industrial use potential of Eden Hill Farm because of the post-death sale to General Foods, there was in his opinion only a remote and speculative possibility, as of the date of decedent’s death, that the farm would be usable for industrial purposes.
While it is clear that in valuing land an appraiser may not deal in possibilities but must deal in reasonable probabilities of future use,[6] the record as a whole fails to bear out Mr. Hanby’s conclusion that the future industrial potential of the Eden Hill Farm as of January 11,1962 was only a remote and speculative possibility. Rather, the record shows (1) that as of that date the Eden Hill Farm had a definite but not substantial industrial potential; and (2) that there was then a reasonable probability that the tract would be sold for industrial use in segments over a lengthy period of time.
That the Eden Hill Farm had a definite industrial potential as of January 1962 is demonstrated by the following factors: The property was adjacent to the City of Dover and was close to sewer and water lines; the city had a new power plant under construction; the property was close to a main highway and its eastern boundary bordered on the railroad tracks; the wage rate in the area was relatively low; Dover wanted industry and the Dover Chamber of Commerce had hired a consulting firm to make a study of the City to be used in attracting industry; the site was one on which site preparation and construction work would not be unduly expensive ; and the site was near medical, housing, school, banking, shopping and restaurant facilities.
The following factors demonstrate, however, that the industrial potential of the Eden Hill Farm, as of January 1962, was not substantial, and that the reasonable likelihood as of *1235 that time was that the property would not be sold for industrial development except in segments extending over a lengthy period: The property was outside the city limits of Dover and was not subject to zoning or building restrictions; the property lacked utility facilities necessary for industrial use; the Dover and Kent County area had experienced slow population growth; the Kent County and Dover area had experienced only very slow industrial development; Dover was located at a considerable distance from centers of population, the nearest metropolitan center being the New Castle-Wilmington area which was some 50 miles away; the property lacked frontage on main through highways; the railroad line on which the property bordered had only limited connections to the south, thus requiring backhauling of commodities to the north; there was a limited skilled labor force available in the area; the property was too large for most single industries; and there was no precedent in the history of the Dover area for an acquisition for industrial use of as much as 100 acres in a single transaction.
Considering that there was a reasonable probability as of January 1962 that the Eden Hill Farm would be sold for industrial use in segments over a length period of time, Mr. Hanby’s testimony provides a rational basis for estimating the nature of, and the time required for, the future absorption of the property for that purpose. This is to say that as of J anuary 1962 the reasonable likelihood existed — based on the past history of industrial development in the Dover area— that (as seen before) industry would come into Dover in 17-year cycles beginning in 1967 and that the approximate 400-acre tract comprising the Eden Hill Farm would be sold for industrial purposes in four segments of approximately 100 acres each over a period of 56 years, with the first sale taking place in 1967. On the basis that the sales of the tract in segments over this 56-year period would be at a price of $2,500 per acre (the average going price for industrial land in the Dover area in J anuary 1962), the value as of January 11, 1962 of such future sales would amount to $300,000 — a figure which is obtained by discounting to January 11, 1962 the sum of the four sales at $250,000 each. But since the record shows that there was — at best — only a 50 percent chance that industry would locate on the Eden Hill Farm site rather than *1236 on other sites in the Dover area, the industrial potential value of the Eden Hill Farm as of J anuary 11,1962 must be reduced by one-half, i.e., to $150,000. An added factor though ('as defendant concedes) is that each of the four future sales for industrial use would not wholly represent gain; for as each sale for industrial use of one-fourth, or 100 acres, of the farm was made at $250,000, there would be lost one-fourth of the value of the property for farming purposes, which amount of loss would come to $36,000 ($143,000 X 14). Thus the value of the property for future industrial use would not be sums of $250,000 discounted to the present (as calculated above) but rather would be sums of $214,000 ($250,000 minus $36,000) at the stated intervals in the future discounted to the present. Applying discount figures of 6 percent {i.e., one dollar in five years would be worth 74 cents today; in 22 years, 27 cents today; in 39 years, 10 cents; and in 56 years, 3 cents) the sums of $214,000 'at these periods in the future would discount to $243,960 as of January 11, 1962.[7] This amount of $243,960 would have to be reduced by one-half, however, to $122,000, to reflect the fact that there was only a 50 percent chance of industry locating on that site instead of other sites. The amount of $122,000 then represents the net industrial development potential of the Eden Hill Farm as of J anuary 11, 1962.[8] In short, on the basis that as of J anuary 11, 1962 the highest and best use of the Eden Hill Farm was *1237 for agricultural purposes with an industrial potential, it is concluded that its total fair market value, as of that date, was $265,000 (or approximately $661.00 per acre), of which amount $143,000 represented its value for agricultural purposes and $122,000 represented its value for potential industrial use.[9]
Defendant insists, however, that plaintiff has failed to prove that the fair market value of the Eden Hill Farm on January 11,1962 was less than $2,700 per acre, its argument being that the post-death sale to General Foods at 'a price of $2,700 per acre is the best evidence of value. Essentially, defendant’s position is that since approximately 30 per cent of the farm was sold eight months after the valuation date at a price of $2,700 per acre, it follows that as of the date of death the farm had a fair market value of $2,700 per acre.
There is no doubt that evidence of a sale taking place after a valuation date has probative force bearing on the value as of the earlier critical date — where there has been no material change of conditions or circumstances in the interim, e.g., Andrews v. Commissioner, 38 F. 2d 55 (2d Cir. 1930); Tabor Mfg. Co. v. Commissioner, 34 F. 2d 140 (3d Cir. 1929); Detroit Trust Co., 25 BTA 340, 345 (1932); Estate of Loewenstein, 17 T.C. 60, 63-64 (1951); Lummus, 21 BTA 79 (1930). Here, by contrast, the record conclusively demonstrates that the circumstances present at the time General Foods decided to purchase 116 acres of Eden Hill Farm at $2,700 per acre were radically different from those prevailing at the date of decedent’s death and could not have reasonably been foreseen as of the date of decedent’s death. The present case thus presents a situation not unlike that pre *1238 sented to the Tax Court in Estate of Wilson, 23 TCM 87 (1964). In Wilson, the single issue was the fair market value for gift tax purposes of farm land, a large part of which was given by a deed of gift on February 20, 1958. The subject property was, at the date of the gift, largely used for farm purposes and was zoned partially for light commercial and in large part for single-family residential use. The tract, which was the subject of the gift, had indented into it two smaller parcels owned by unrelated parties as of the date of the gift. On March 10,1958 (within less than a month after the gift), the donees petitioned for a rezoning of part of the formerly residentially zoned tract to a zoning of light commercial. On June 2, 1958 (less than four months after the gift), the requested zoning was granted by the appropriate public authority. On May 21, 1958, the donees acquired by purchase one of the small properties indented in the larger tract which had been the subject of the gift. On July 29,1959 (over 17 months after the gift), the donees acquired by purchase another small parcel indented in the tract which had been the subject of the gift. An additional fact was that the community in which the gift property was situated was, at the date of the gift, changing from an agricultural to a commercial and urban community. The Tax Court rejected 'as a basis for valuation the sales price paid by the donees for the smaller tracts indented in their larger holding. It stated (23 TCM at 90) :
Experts for both parties rely on sales of what they each claim to be comparative property and both parties dispute whether many of the sales were in fact comparable and, if so, to what extent they evidence fair market value as of the effective date of the gift. Subsequent sales may not be an evidence of value unless the transaction could have been foreseen and, as much of the development of the property in question tooh place after the date of the gift, it was not foreseeable, at least in detail, on February W, 1958. [Emphasis supplied.]
See also e.g., Knoell v. United States, 236 F. Supp. 299 (W.D. Pa. 1964); Estate of Wolfe, 13 TCM 22 (1954); Estate of Pascal, 22 TCM 1766, 1769 (1963).
As for the present case, there is not a scintilla of evidence in the record that as of January 11,1962 (the date of the de *1239 cedent’s death), it could have reasonably been foreseen by even the most optimistic of real estate speculators (1) that a large national corporation would, within eight months, exercise an option to acquire 116 acres of Eden Hill Farm, and (2) that to assure consummation of the transaction, the City of Dover would commit itself to expend over $900,000 for extensions of sewer and water systems to accommodate that corporation. The commitment of the City of Dover to expend this amount in order to induce General Foods to locate its plant in the Dover area was only one of the dramatic changes in circumstances with respect to the subject property which occurred between the date of decedent’s death and the consummation of the General Foods’ transaction. In the same interval: the property was annexed into the City of Dover; was zoned with a classification entirely new to the Dover area; the officials of Delaware Power & Light Company were able to secure from the City of Dover a concession with respect to the invasion of the latter’s utility franchise area for the furnishing of electric power to General Foods’ new plant; and the City of Dover agreed to General Foods’ request for a binding agreement with respect to trash removal services at the contemplated plant site.
Nor was there anything in the history of the industrial development of the Dover area or of Kent County which would have made these developments in any wise foreseeable as of the date of Mrs. Kidgely’s death. Indeed, the record demonstrates that all the occurrences which eventuated in the General Foods purchase of approximately 30 per cent of the Eden Hill Farm took place entirely after her death. Under such circumstances, it is impossible to contemplate a prospective purchaser of Eden Hill Farm who would have offered a price for it 'based upon the proposition that within eight months any of the property might be sold for $2,700 per acre or anything near that figure.
Since the record thus establishes that the post-death sale to General Foods was the result of dramatic changes in circumstances which could not have reasonably been foreseen at the time of Mrs. Kidgely’s death, it follows that that sale lacks probative force in determining the fair market value of the Eden Hill Farm at the date of her death.
*1240 Also lacking probative force in respect of the valuation of the Eden Hill Farm at the date of decedent’s death is the fact that prior to that date the decedent had offered 40 acres of the farm (roughly 10 per cent of the farm’s total acreage) to the Dover School Board as a site for. a new school — which site the Board rejected. For the evidence (as previously stated) shows that: (1) the initial $3,000 per acre asking price was determined not on the basis of any appraisal of the property but on the basis of what it was understood the Board was willing to pay for a site; (2) when the decedent’s representatives learned that the Board was reluctant to give serious consideration to Eden Hill Farm as a site for the new school, the decedent’s representatives lowered their asking price to $2,000 per acre and then to $1,000 per acre; and (3) the Board never accepted any of these offers to sell and never made any counter offer to buy any part of the Eden Hill Farm. To attempt to base a valuation of some 400 acres of Eden Hill Farm on such evidence would be contrary not only to logic but to an established legal principle that proof of an offer to buy or sell land is not competent to show its value. 20 Am. Jur. Evidence § 375; Anno. 7 ALB 2d 781. Such proof “is of a nature entirely too uncertain, shadowy and speculative to form any solid foundation for determining * * * value. * * * ” Sharp v. United States, 191 U.S. 341, 348 (1903). See also e.g., United States v. Dillman, 146 F.2d 572, 575 (5th Cir. 1944), cert. denied, 325 U.S. 870 (1945).[10]
There is an additional reason why the proffered testimony lacks probative weight. The issue in the case concerns the *1241 valuation of the entire Eden Hill Farm consisting of some 400 acres. Tbe offer to the School Board was with respect to approximately 10 per cent of the farm, i.e., 40 acres, and there was no specification of a particular 40-acre site which was being offered. Thus, the property which was the subject of the offer, was far different than the property which is in issue in this suit.
In summary, as of January 11, 1962, the 'highest and best use of Eden Hill Farm was for agricultural purposes with an industrial potential. Its fair market value as of that date was $265,000 (or approximately $661.00 per acre), of which amount $143,000 represented its value for agricultural purposes only, and $122,000 the enhancement in value due to potential industrial use.
THE REHOBOTH COTTAGE
We consider now whether the decedent’s transfers of her interest in the Rehoboth Cottage and lot were gifts in contemplation of death. The facts are these. In 1911, the decedent’s husband purchased property at Rehoboth Beach, Delaware, consisting of a lot on the ocean front approximately one block in length and half a block in depth. In the year after the acquisition of the property, he built at the southerly end of the lot a summer cottage — which is referred to in this proceeding as the Rehoboth Cottage.
The decedent and her husband had one child — a daughter, Philippa Ridgely, who in turn had two children, a son, Henry R. Horsey (executor of the plaintiff), and a daughter, Philippa Lloyd Horsey (now Mrs. Lloyd Scheller). At the time of birth of her first grandchild, the decedent’s husband built for the use of his daughter and her family a second cottage on the ocean lot just mentioned. On the birth of the second grandchild, her husband enlarged this cottage.
The decedent’s husband died in 1940, leaving the Rehoboth Cottage and the cottage built for his daughter to the decedent who gave the latter property to her daughter a short time later.
The decedent’s husband had been an attorney with offices in Dover. He was blind and had made extensive use of the Rehoboth Cottage where he was able to walk around unas *1242 sisted and to enjoy ocean bathing. But the decedent, unlike her husband, did not enjoy the Rehoboth Cottage, preferring to vacation in mountain areas. As a result, following the death of her husband, she made almost no use of the property and made no substantial improvements to it. Shortly after her husband’s death, she purchased a summer home in the mountains southeast of Albany, New York, where she thereafter spent her summers when not traveling abroad.
The decedent had given gifts to her family from time to time which consisted mainly of interests in real estate. In 1940, she gave her daughter the ocean-front cottage. In the period 1948 to 1950, she made substantial improvements to the farmhouse at Eden Hill Farm which was then occupied by her granddaughter and her husband, which improvements cost from $12,000 to $15,000. In 1949, her grandson graduated from Harvard College and on that occasion she paid for all his expenses on a trip to Europe, on a part of which she accompanied him. In 1951, she gave her grandson three lots near the property on which the Rehoboth Cottage is situated. In 1953, she transferred to her daughter and her two grandchildren an office building in Dover. In 1955, she gave her grandson and her granddaughter her mountain property near Albany, New York.
The decedent’s grandson was married in April 1954. He had five children, the first of whom was bom in February 1955; the second, July 1956; the third, in May 1960; and the fourth and fifth (twins)., in January 1962. The grandson and his wife and small children made infrequent use, during 1959, of the cottage owned by his mother due to the fact that it was comparatively small and was overcrowded when occupied by the grandson and his family — a situation which was known to the decedent. As of this time, the grandson had insufficient assets to enable him to contemplate purchasing the Rehoboth Cottage from his grandmother and told her that he would like to have the use of it for 'himself and his family.
By deeds dated, respectively, November 19,1959, January 14, 1960, and January 3, 1961, the decedent conveyed to her grandson, Henry R. Horsey, and his wife, successive one-third interests in her Rehoboth Cottage. The gifts were sug *1243 gested by tbe grandson (who was at the time a practising attorney familiar with estate planning and federal estate and gift taxes). In accordance with Ms suggestion, the property was deeded in three installments rather than in one transaction to avoid a gift tax on the transfers inasmuch as the decedent had exhausted her lifetime gift tax exemption as of 1959.
Under the terms of the decedent’s will, which was executed in September 1958, her grandson was to receive the Kehoboth Cottage which was the subject of the gifts. He did not know, however, of the terms of her will until after her death.
Decedent was 89 years of age at the time of her death and was 87, 87 and 88 years old, respectively, at the dates of the transfers in 1959, 1960 and 1961 of her interest in the Eehoboth Cottage.
For the last five years of her life from 1957 to 1962), the decedent was under the care of a doctor because of hypertensive and arteriosclerotic cardiovascular disease with marked cardiac hypertrophy,[11] and her death was caused by a cerebral vascular hemorrhage. Nevertheless, during the last 15 years of her life, she was not hospitalized except for the period of seven or eight days immediately preceding her death. During the last 15 years of her life, she had not complained to her family of ill health or of not feeling well, although she was not the type of person to complain even if something was wrong with her. She also traveled extensively during this period, making it a practice to spend two to two and one-half months every other summer traveling in Europe. In the summer of 1959, when she was 86 years old, she traveled to Europe alone. In the last 15 years of her life, she entertained guests practically every day and hosted a large Christmas party every year, including the Christmas of 1961 immediately preceding her death. For 50 years she was the President of the State ArcMves Commission and had from time to time served on other State commissions. She resigned from the State ArcMves Commission only a short time before 'her death.
*1244 Shortly after the decedent in 1959 had transferred the first one-third interest in her Rehoboth Cottage, she wrote to her grandson and in commenting on the transfer of the cottage stated in part:
It gives me deep delight to have the cottage turned over to you!
Maybe I’ll want some time to make a final visit to it.
But at a time not inconvenient to you & Alexandra.
Its satisfying that it is going to be used and enjoyed.
Section 2035 (b) of the 1954 Code provides that a gift made within three years before a transferor’s death shall be presumed to have been in contemplation of death, but further provides that the presumption is rebuttable. Whether or not a transfer is in contemplation of death is a question of fact which depends upon the transferor’s state of mind. The guideposts, as established in United States v. Wells, 283 U.S. 102 (1931) — the landmark decision on transfers in contemplation of death — are as follows: “The dominant purpose” of the tax on such transfers (the Court stated at pp. 116-119) “is to reach substitutes for testamentary dispositions and thus to prevent the evasion of the estate tax. * * * As the transfer may otherwise have all the indicia of a valid gift inter vivos, the differentiating factor must be found in the transferor’s motive. Death must be ‘contemplated,’ that is, the motive which induces the transfer must be of the sort which leads to testamentary disposition. * * * The question, necessarily, is as to the state of mind of the donor. As the test, despite varying circumstances, is always to be found in motive, it cannot be said that the determinative motive is lacking merely because of the absence of a consciousness that death is imminent. * * * It is conceivable that the idea of death may possess the mind so as to furnish a controlling motive for the disposition of property, although death is not thought to be close at hand. Old age may give premonitions and promptings independent of mortal disease. Yet age in itself cannot be regarded as furnishing a decisive test, for sound health and purposes associated with life, rather than with death, may motivate the transfer. The words ‘in contemplation of death’ mean that the thought of death is the impelling cause of the transfer. * * * If it is the thought of death, as a controlling motive prompting the disposition of property, *1245 that affords the test, it follows that the statute does not embrace gifts inter vivos which spring from a different motive. * * * It is apparent that there can be no precise delimitation of the transactions embraced within the conception of transfers in contemplation of death’. * * * There is no escape from the necessity of carefully scrutinizing the circumstances of each case to detect the dominant motive of the donor in the light of his bodily and mental condition, and thus give effect to the manifest purpose of the statute.”[12]
In the present case, it is to be noted at the outset that decedent transferred her interest in the Rehoboth Cottage within three years of the date of her death and thus, the transfers are presumed to have been made in contemplation of death unless rebutted. Considering the entire factual pattern, it must be concluded that plaintiff has not overcome the presumption and that the transfers were thus ones in contemplation of death.
For one thing, decedent was 87 and 88 years old on the dates of the gifts and while her advanced age is hardly decisive of the character of the transfer, it is a “strong and pertinent factor to be considered in ascertaining * * * [her] motives.” Burns v. Commissioner, 177 F. 2d 739, 741 (5th Cir. 1949). See also e.g., Updike v. Commissioner, 88 F. 2d 807, 811 (8th Cir. 1937), cert. denied, 301 U.S. 708; Butterworth v. Usry, 177 F. Supp. 197 (E.D. La. 1959); Old Colony Trust Co. v. Delaney, 69 F. Supp. 495 (D. Mass. 1947). For a person of advanced years “is more apt to be prompted by the thought of death in disposing of his property than a young one. Consequently if the decedent had attained, an advanced age when he made the transfer, this has a tendency to show that the transfer was in contemplation of death.” Lowndes & Kramer, *1246 Federal Estate and Gift Taxes, p. 72.[13] Moreover, at the time of the gifts the decedent was under a doctor’s care for a serious cardiovascular ailment (which ultimately caused her death) and though unusually active for a person of her advanced years was not, it is reasonable to believe, unaware of her medical diagnosis. See e.g., Harris Trust v. United States, 90 Ct. Cl. 17, 29 F. Supp. 876 (1939), cert. denied 310 U.S. 632 (1940); Lawrence v. Anderson, 17 F. Supp. 357 (S.D. N.Y. 1936); Lynch, 35 T.C. 142 (1960).
What is of particular significance, too, is the fact that decedent’s grandson, the recipient of the transfers in question, was not only one of the natural objects of the transferor’s bounty, he was to have received the Eehoboth Cottage in any event under the terms of decedent’s will which was executed in 1958, approximately one year prior to the first transfer. In this respect the gifts anticipated the bequests in the decedent’s will and thus would appear to have been but “substitutes for testamentary dispositions.” United States v. Wells, supra, 283 U.S. at 117. See also Smails v. O'Malley, 127 F. 2d 410, 415 (8th Cir. 1942); Reeves' Estate v. Commissioner, 180 F. 2d 829, 831 (2d Cir. 1950), cert. denied 340 U.S. 813.
Nor does the letter the decedent wrote to her grandson shortly after the first transfer establish (as plaintiff argues) that the decedent’s dominant motive in making the transfers was a life motive — to see her grandson and his growing family enjoy the Eehoboth Cottage during her life. The letter is suggestive rather of a person possessed by the thought of death wanting her grandson and his family to enjoy the property. For in that letter (as previously set out) she not only stated: “Its satisfying that it [the Eehoboth Cottage] is going to be used and enjoyed,” immediately before that statement she wrote: “Maybe I’ll want some time to make a final visit to it. But at a time not inconvenient to you & Alexandra.” [Emphasis supplied.] The latter statement considered in the context of her advanced age and medical condition more nearly reflects the state of mind of a person possessed *1247 by thoughts of death than of a state of mind consistent with life.
It is also suggested by plaintiff that the transfers were part of a lifetime plan of making gifts to decedent’s family. But although decedent had previously made gifts to her family, there is no evidence of any well-considered or established plan to that end or that this was the dominant motive for the transfers in question. See Russell v. United States, 93 Ct. Cl. 675, 692, 38 F. Supp. 438, 447 (1941). Additionally it is suggested that an apparent motive of decedent was to maintain equality of treatment between her granddaughter and grandson — and that the gift of the Eehoboth Cottage was to counterbalance the substantial improvements she made to her own property (the Eden Hill Farm) which was being occupied by her granddaughter. To equate the two, however, would seem wholly conjectural.
In the last analysis, plaintiff’s proof — at most — would indicate that the decedent’s transfers of her interest in the Eeho-both Cottage were actuated both by thoughts of death and by thoughts associated with life. But this is not enough to overcome the statutory presumption. This is to say that “the burden is not met if a motive is disclosed which is as consistent with a testamentary disposition of * * * [her] property as with a gift inter vivos; or if two motives are disclosed, either of which might have accounted for the transfer, the one testamentary and the other not.” Land Title & Trust Co. v. McCaughn, 7 F. Supp. 742, 744 (E.D. Pa. 1934), reversed 79 F. 2d 602 (3d Cir. 1935), in turn reversed per curiam 297 U.S. 606 (1936). See also Gregg v. United States, 82 Ct. Cl. 350 (1936); Farmers' Loan & Trust Co. v. Bowers, 68 F. 2d 916, 924 (2d Cir. 1934), cert. denied, 293 U.S. 565; Gross v. Rothensies, 65 F. Supp. 92, 94 (E.D. Pa. 1946). To overcome the presumption the taxpayer must show affirmatively, by a preponderance of the evidence, that the motives associated with life were the dominant, controlling or impelling motives for the gift. United States v. Wells, supra, 283 U.S. at 118. See also Allen v. Trust Co. of Georgia, 326 U.S. 630, 636 (1946); Harris Trust v. United States, supra, 90 Ct. Cl. at 26-27, 29 F. Supp. at 880; First Trust & Deposit Co. v. Shaughnessy, 134 F. 2d 940, 942 (2d Cir. 1943), cert. denied *1248 320 U.S. 744. Indeed, considering the age of the decedent at the time of the transfers, her medical condition, the fact that the donee was one of the natural objects of her bounty, the fact that the donee was in any event to have inherited the property under the terms of her will, and the contents of her letter shortly after the first transfer, it would appear that the dominant motive which induced the decedent to make the transfers was a thought of death notwithstanding that she may then have had other motives associated with life.
In brief, since the decedent’s transfers of her interest in the Behoboth Cottage were gifts in contemplation of death, the property was includible in her taxable estate.
FAIR MARKET VALUE OF FARMERS BANK STOCK
As of the date of her death, the decedent owned 510 shares of stock of Farmers Bank of Delaware and such stock was included in her gross estate at a value of $106.00 per share and at an aggregate value of $54,060. The reported price of Farmers Bank stock on the date of decedent’s death, as reported in the newspapers, was $115.00 bid, $125.00 asked. On February 17, 1962, the plaintiff-estate sold at a price of $115.00 per share 200 shares of the Farmers Bank stock which was included in decedent’s estate. The sale was made to Laird, Bissell & Meeds, a brokerage firm, which also purchased and sold securities and handled about 90 per cent of the stock transactions in the Farmers Bank. A short time later, Laird, Bissell & Meeds sold these 200 shares to a customer at $117.00 per share.
The only witness as to the valuation of the Farmers Bank stock as of the date of decedent’s death on January 11,1962 was Alfred E. Bissell, Chairman of the Board of Laird, Bis-sell & Meeds, who was called by plaintiff and testified that in his opinion, based on the thinness of the market for such stock at that time and the size of the block of stock held by the decedent, such stock had a value as of the date of decedent’s death of no more than $100.00 per share.[14]
*1249 Plaintiff claims that the size of the stock owned by decedent brings it within the blockage rule and that the stock should thus be valued at not more than $100.00 per share in accordance with its expert’s opinion. The rule of blockage — which the courts have consistently recognized — is that in valuing securities a large block of stock may be worth less on a per share basis than the quoted per share prices for smaller blocks of stock because of the depressing effect on the market that would be caused by the sale of the large block. See e.g., Helvering v. Safe Deposit & Trust Co., 95 F. 2d 806 (4th Cir. 1938); Commissioner v. Shattuck, 97 F. 2d 790 (7th Cir. 1938); Helvering v. Kimberly, 97 F. 2d 433 (4th Cir. 1938); Phipps v. Commissioner, 127 F. 2d 214 (10th Cir. 1942), cert. denied, 317 U.S. 645. The blockage theory is also recognized in section 20.2031-2 (e) of the Treasury Regulations which provides in part:
If it is established that the value of any bond or share of stock determined on the basis of selling or bid and asked prices * * * does not reflect the fair market value thereof, then some reasonable modification of that basis or other relevant facts and elements of value are considered in determining the fair market value. Where sales at or near the date of death are few or of a sporadic nature, such sales alone may not indicate fair market value. In certain exceptional cases, the size of the block of stock to be valued m relation to the number of shares changing hands in sales may be relevant in determining whether selling prices reflect the fair market value of the block of stock to be valued. If the executor can show that the block of stock to be valued is so large in relation to the actual sales on the existing market that it could not be liquidated in a reasonable time without depressing the market, the price at which the block could be sold as such outside the usual market, as through an underwriter, may be a more accurate indication of value than market quotations.
Blockage is not applicable here, however. For the record fails to establish that the effect of marketing the 510 shares involved would be to depress the market price; in fact, 200 of these 510 shares were sold within a short time after the valuation date without depressing the market price in the slightest. When added to this it is considered (i) that plaintiff’s expert *1250 witness gave no indication of how he arrived at his $100.00 per share valuation, (ii) that there is no evidence of any sale at a price anywhere approaching that amount, and (iii) that plaintiff’s expert witness conceded that the sale by decedent’s estate of 200 shares of the stock at $115.00 per share was at or near the going market price at that time, the conclusion is inescapable that the market value of $115.00 per share for the stock is the best evidence in the record of its actual value. It is concluded, in short, that as of the date of decedent’s death on January 11, 1962, the fair market value of 510 shares of Farmers Bank stock owned by decedent was $115.00 per share, or a total of $58,650.
FINDINGS of Fact
1. Decedent Mabel Lloyd Eidgely, a resident of Dover, Kent County, Delaware, died testate on January 11, 1962. Henry E. Horsey, the decedent’s grandson, qualified and was duly appointed as Executor of the Estate of Mabel Lloyd Eidgely on January 15, 1962. The Estate of Mabel Lloyd Eidgely will be referred to hereafter as “plaintiff.”
2. On October 9,1962, a federal estate tax return was filed for the plaintiff with the District Director of Internal Eeve-nue for Wilmington, Delaware.
3. The federal estate tax return filed on behalf of the plaintiff showed the following:
Taxable estate_$438, 012. 04
Gross estate tax_ 125, 863. 85
Credit for State death taxes_ 9, 936.39
Gross estate tax less credit for State death taxes_ 115,927.46
Net estate tax payable- 115, 927.46
4. The plaintiff elected to have the property forming the gross estate valued as of the date of death — January 11, 1962 — rather than at the value thereof on the optional valuation date — J anuary 11,1963.
5. On October 19,1962, plaintiff paid the federal estate tax to the District Director of Internal Eevenue at Wilmington, Delaware, in the amount of $115,927.46.
6. Among the items of property shown on the plaintiff’s federal estate tax return were the following:

*1251
Value per Return

(a) A 368-aere farm in Kent County near Dover, Delaware, known as “Eden Hill Farm” (hereafter referred to as “Eden Hill Farm”)-$137,100. 00
(b) Decedent’s borne and garden on Tbe Green in Dover (hereafter referred to as the “House on the Green”)_ 41,900.00
(c) A 100' x 100' lot in Rehoboth Beach, Delaware (hereafter referred to as “Rehoboth lot”)- 8,200. 00
(d) 510 shares of capital stock of Farmers Bank of Delaware at $106.00 per share (hereafter referred to as “Farmers Bank stock”)_ 54, 060. 00
7. Also shown on plaintiff’s estate tax return but not in-cludible in the taxable estate was an ocean-front lot with summer cottage thereon in Rehoboth Beach (hereafter referred to as “Rehoboth Cottage”) which decedent had given to Henry R. Horsey, her grandson, and his wife, Alexandra Leigh-Hunt Horsey, by deeds executed in 1959, 1960 and 1961.
8. On July 2,1964, the Commissioner of Internal Revenue issued a statutory notice of deficiency setting forth a proposed determination of estate tax against the plaintiff, as follows:
Additions to value of taxable estate_$1, 010, 600. 00
Taxable estate- 1,448,612. 02
Gross estate tax_ 506, 617.08
Plaintiff’s gross estate tax was thereby increased by the amount of $380,753.21 over the amount of the gross estate tax which was shown on the original estate tax return.
9.The increase in federal estate tax asserted by the Commissioner of Internal Revenue was attributable to the f ollow-ing adjustments:
(a) The assertion that the decedent’s transfer to her grandson and his wife of the Rehoboth Cottage was a gift in contemplation of death which, as of the date of the decedent’s death, had a value of $33,000. By stipulation the parties have agreed that the Rehoboth Cottage, if includible in decedent’s gross estate as a gift in contemplation of death, had a value as of the date of the decedent’s death of $25,000.
(b) The assertion that the House on the Green had a value as of the date of her death of $75,000. By stipulation the parties have agreed that the House on the Green had a value as of the date of the decedent’s death of $50,000.
*1252 (c) The assertion that the Rehoboth lot had a value as of the date of the decedent’s death of $19,000. By stipulation the parties have agreed that such property had a value as of the date of the decedent’s death of $15,000.
(d) The assertion that the Farmers Bank stock had a value as of the date of the decedent’s death of $58,650.
(e) The assertion that Eden Hill Farm had a value as of the date of the decedent’s death of $1,061,870.
(f) The valuation of Eden Hill Farm proposed by the Commissioner of Internal Revenue was based upon an audit by a revenue agent who was not an expert in real estate appraisement.
10. Subsequent to filing the estate tax return, the plaintiff called to the attention of the Internal Revenue Service the fact that Eden Hill Farm consisted of 393.1 acres, rather than the 368 acres originally reported in the estate tax return. This increased acreage for the Eden Hill Farm was reflected in the value asserted by the Internal Revenue Service as shown above.
11. In addition to the federal estate tax paid at the time of filing the original return, as set out in finding 5, plaintiff paid additional estate tax, plus interest, to the Internal Revenue Service, as follows:
Date of Payment Tax Interest
May 20, 1963. $198,000.00 $1,282.93
October 15, 1903.... 160,000.00 ...
November 29, 1963. 20,000.00 __
Total..... $378,000.00 $1,282.93
12.On August 13, 1964, plaintiff timely filed with the District Director of Internal Revenue for Wilmington, Delaware, a claim for refund of estate tax and deficiency interest based upon the alleged erroneous revaluation of the House on the Green, the Rehoboth lot, Eden Hill Farm, and the Farmers Bank stock; the alleged erroneous inclusion of the Rehoboth Cottage and the alleged erroneous valuation of such cottage; and the alleged erroneous failure to allow administration expenses paid to the date of filing the refund claim and estimated expenses of contesting the asserted estate tax deficiencies.
*1253 13. By letter and notice of adjustment (Treasury Department Form 1331), both dated October 20, 1964, the Internal Eevenue Service notified the plaintiff that the claim for refund referred to in finding 12 had been disallowed except for an overcharge of $1,921.43, attributable to the allowance of credit for State taxes paid to that date.
14. On December 23, 1964, plaintiff timely filed with the District Director of Internal Eevenue for Wilmington, Delaware, a supplemental claim for refund. The supplemental claim for refund asserted the same bases for refund as were set forth in the original refund claim referred to in finding 12, with modifications of the administration expenses claimed.
15. By letter dated February 3,1965, the Internal Eevenue Service notified the plaintiff that the supplemental claim had been disallowed, except to the extent of $986.28. The action was based on disallowance of certain of the additional administration expenses and debts of the decedent referenced in the supplemental refund claim and disallowance of certain administration expenses claimed in the estate tax return and allowed in prior audits.
16. On February 15,1965, the plaintiff paid to the District Director of Internal Eevenue at Wilmington, Delaware, an additional amount of $2,710.76. The amount was determined as follows:
Balance due as per statement of tax and interest due (Form 17A notice dated October 23, 1964)-$3,742.95
Less: Overassessment per February 3, 1965 letter_ (986.28)
Plus interest from November 3, 1964 to February 15, 1965 on amount shown on Form 17A_ 64. 88
Less: Interest from April 12, 1963 to February 15, 1965 on overassessment of $986.28_ (110.79)
Net_$2,710.76
17.By stipulation the parties have agreed that the plaintiff is entitled to deduct as administration expenses paid on or before July 15, 1964, $2,837.03, and that, in addition, the plaintiff is entitled to deduct expenses paid since July 15, 1964 attributable to this suit for refund, subject to proof as to reasonableness, payment and amount prior to entry of final judgment.
*1254 18. The issues remaining in dispute with respect to the plaintiff’s federal estate tax liability are:
fa) The valuation of Eden Hill Farm;
(b) The includibility in the decedent’s gross estate of the Eehoboth Cottage;
(c) The valuation of 510 shares of Farmers Bank stock.
VALUATION OF EDEN HILL FARM
19. The decedent, Mabel Lloyd Eidgely, as of the date of her death, owned Eden Hill Farm which was situated in Kent County, Delaware, adjacent to but outside the city limits of the City of Dover, Delaware.
20. As of the date of the decedent’s death (January 11, 1962), Eden Hill Farm consisted of 393.1 acres of land, of which 55 acres were woodland. The balance (338 acres) consisted of tillable land and areas covered by farm-type buildings.
21. At the date of decedent’s death, the Eden Hill Farm was used solely for farming purposes as a grain farm) and contained a residence occupied at that time by the decedent’s granddaughter and her husband who farmed the property. The Eden Hill Farm had been owned by the decedent, her deceased husband, and the ancestors of her deceased husband since 1749 and had, during all of such period, been used solely for farm purposes.
22. (a) The buildings on Eden Hill- Farm as of the date of decedent’s death consisted of: (a) A two-story brick residence which contained ten rooms, one bath and one lavatory; (b) two frame barns; (c) a milk house; (d) a feed-house; (e) a chicken house; (f) a carriage house; (g) a concrete-block machinery shed and various other sheds. The farm buildings were in poor condition except for the machinery shed which was in fair condition. The house, however, was in good condition and was termed by plaintiff’s appraiser to be a “delightful” house. Decedent had spent $12,000 to $15,000 remodeling the house in the period 1948-1950.
(b) There were also located on the farm four frame tenant houses, all in very bad condition not having been used for many years.
*1255 23. The property was an irregularly shaped, four-sided parcel of land which sloped generally in a southwesterly direction. It was bounded on the north by Hazlettville Eoad (the only public road touching the farm) with a frontage of 4,794 feet. Hazlettville Eoad marked the city line of Dover. The easternmost boundary of the property was approximately 6,500 feet long and bordered on the tracks of the Pennsylvania Eailroad. These tracks also marked the city line of Dover and separated the farm from the City of Dover. The southern boundary of the farm was approximately 1,300 feet long and was formed by a stream known as Puncheon Eun, adjacent to which was farm land. The western boundary was approximately 4,000 feet long and was formed by a boundary with another farm.
24. (a) Dover, itself, is the State Capital of Delaware. As of the time of the decedent’s death, it had a total population of about 7,250 and a total area within its city limits of six to eight square miles.
(b) As of the date of the decedent’s death, most of the City of Dover was located in the area between the Pennsylvania Eailroad tracks which ran north and south on the west and U.S. Highway 13 By-Pass, which paralleled the railroad tracks, on the east. This part of Dover was approximately one mile in width and two and one-half miles in length and extended from approximately the southern boundary of the Eden Hill Farm to a point about one and one-half miles north of the Eden Hill Farm.
(c) The main north-south thoroughfares through Dover were the Eoute 13 By-Pass and Governors Avenue, which was located approximately halfway between the Pennsylvania Eailroad tracks and the Eoute 13 By-Pass, and approximately four blocks east of the Eden Hill Farm. The other through north-south street was State Street which was two blocks to the east of Governors Avenue. The principal east-west street through the city was Division Street which was redesignated as Hartly Eoad west of the Pennsylvania Eail-road tracks. Hartly Eoad ran parallel to and about one-half mile north of Hazlettville Eoad.
(d) The main shopping area of downtown Dover was east of the Pennsylvania Eailroad tracks and was located on Lock- *1256 erman Street which ran. in an east-west direction two or three blocks south of and parallel to Division Street. The main business area was located along Lockerman Street between Governors Avenue and State Street. North Street was one block south of Lockerman Street and ran parallel to Locker-man and Division Streets.
25. The center of the downtown Dover business area was approximately 2,000 feet (about eight rather long blocks) from the northeast comer of Eden Hill Farm nearest to the town.
26. The direct approach to Eden Hill Farm from the business center of the City of Dover was westerly via North Street, through an extremely substandard housing area. The area had been the subject of an urban renewal plan which, however, was not implemented by any actual work.
27. There was a single steep grade crossing at the intersection of North Street and the Pennsylvania Eailroad tracks (i.e., at the northeast corner of Eden Hill Farm). At this crossing North Street was redesignated as Hazlettville Eoad and proceeded westerly along the northern boundary of Eden Hill Farm.
28. At the northeast comer of the intersection of North Street and the Pennsylvania Eailroad tracks there were coal bins; at the southeast comer there was a highway transfer warehouse; at the northwest comer there were fuel tanks, truck parking facilities and cold storage buildings.
29. Hazlettville Eoad (the northern boundary of Eden Hill Farm) was not one of the main traffic arteries for traffic entering and leaving Dover. It was a black-top road which did not lead to any town of importance, but rather led into a dairy farming area. Traffic on this road was sparse, consisting of approximately 25 per cent horse and wagon traffic and 75 per cent automobile traffic.
30. (a) The area to the north, opposite Eden Hill Farm across Hazlettville Eoad, was approximately 50 per cent vacant land and 50 per cent developed with single-family houses, most of which were unattractive and substandard.
(b) Prior to 1960 construction had been started on a new residential development — Lincoln Park— consisting of 60 building lots in an area approximately 800 feet north of Eden Hill Farm and beyond the substandard single-family area. *1257 The Lincoln Park development was only half built at the time of the decedent’s death, the project having come to a virtual standstill because of financial problems. No permits for construction in Lincoln Park had been granted during 1960,1961 and 1962.
(c) A portion of the vacant property across from Hazlett-ville Eoad known as the Mifflin Farm, consisting of 15 acres, had been purchased in November 1961 by the City of Dover Housing Authority for use as a low-cost housing project.
31. (a) Proceeding northerly along the Pennsylvania Bailroad tracks from the Hazlettville Boad-North Street grade crossing, the next grade crossing of the tracks lay approximately 800 feet north and did not provide direct access to the Eden Hill Farm.
(b) Proceeding in a southerly direction along the Pennsylvania Bailroad tracks from the Hazlettville Boad-North Street grade crossing, the next crossing of the tracks was a grade crossing in the small town of Wyoming, Delaware, approximately two and one-half miles away.
(c) There were no underpasses or overpasses along the Pennsylvania Bailroad tracks for a distance of at least three miles in a northerly direction and 4.6 miles in a southerly direction from the Hazlettville Boad-North Street crossing.
32. Adjacent to the eastern boundary of Eden Hill Farm across from the Pennsylvania Bailroad tracks were (proceeding from south to north) two new residential developments known as Sherwood and Woodbrook; a reserved area belonging to the City of Dover for park land; a farmers’ auction establishment; and several blocks of older single-family residences. These areas were separated from the Eden Hill Farm by the railroad tracks, with no grade crossing or overpass or underpass connecting the farm with such areas. See findings 31(b) and (c).
33. As previously set forth, the western and southern boundaries of the Eden Hill Farm bordered on farm lands. See finding 23.
34. Located to the north, east and south of the downtown Dover business area at a similar distance as the Eden Hill Farm were substantial residential areas. Unlike Eden Hill Farm, however, those areas were not separated from the *1258 center of Dover by substandard bousing or tbe Pennsylvania Railroad tracks.
35. At the time of the decedent’s death, Eden Hill Farm and lands adjacent to and outside of the City of Dover were not subject to any zoning or building restrictions.
36. (a) At the time of the decedent’s death, the Eden Hill Farm lacked public utility services necessary for industrial or residential purposes.
(b) The public sewer line nearest Eden Hill Farm consisted of an eight-inch line running along the north side of Hazlettville Road where there were houses; this line extended about 1,050 feet along approximately one-fifth the northern boundary of the farm. Located about 100 feet north of the northeast corner of the farm was a main interceptor sewer which ran to the sewage disposal plant in the eastern part of town. There were city sewers in the Sherwood and Wood-brook developments across the railroad tracks.
(c) The Eden Hill Farm was not served by the public water system. Four and six-inch city water lines served the area immediately across Hazlettville Road and these lines possibly could have been extended to the farm to serve residents, but not industry. The residential area across the railroad tracks to the east of the farm was served by a 10-inch water line.
37. (a) As of the date of the decedent’s death, the Eden Hill Farm was served by a 2,400-volt city electricity line. Lines carrying 4,160 volts were located adjacent to the property along Hazlettville Road on the north and the railroad tracks on the east.
(b) Eden Hill Farm was in the franchise area for the City of Dover Municipal Power Company and that company, as of the date of the decedent’s death, had a new power plant under construction.
(c) The electric power facilities available to Eden Hill Farm, even upon completion of this new power plant, were inadequate for a major industrial plant.
38. As of the date of the decedent’s death, the principal manufacturing and industrial plants in the Dover area were: (i) the Richardson & Robbins plant which was built in 1880 for the purpose of processing and packing chicken products, *1259 and was located east of the Pennsylvania Railroad tracks between Division and Lockerrnan Streets to the east of State Street; (ii) the “old” International Latex plant, which was built in 1937 and was located in the eastern part of Dover along the Route 13 By-Pass; (iii) the “new” International Latex plant which was built in or about 1954 and was situated outside the city limits of Dover along the west side of the Pennsylvania Railroad tracks, approximately three-quarters of a mile north of the Eden Hill Farm; and (iv) the Coty plant, a small plant for use in distributing perfume products, which was built in 1951 and was located outside the city limits of Dover along the west side of the Pennsylvania Railroad tracks approximately one and three-quarter miles north of the Eden Hill Farm. International Latex also had a plant located on the eastern side of the Pennsylvania Railroad tracks just across from the plant built in 1954, but the record is not clear whether this plant was built as part of the original plant in 1937 or the new plant built in 1954. Neither the Richardson & Robbins plant nor the “old” International Latex plant was located along the railroad tracks.
39. The great bulk of residential, commercial and industrial development in the Dover area has been to the east of the Pennsylvania Railroad tracks. See findings 24 (b) to (d).
40. The railroad tracks of the Pennsylvania Railroad have, in general, acted as a barrier to development west of the railroad although there has been scattered development west of the tracks, such as the new International Latex plant, the small Coty distribution plant, and low-cost housing developments. Only two housing developments were started west of the railroad tracks in the period prior to 1962. One of these was Northwest Dover Heights over a mile from Eden Hill Farm. The other — Lincoln Park — consisting (as seen before) of 60 building lots — -was only half built by the time of decedent’s death, and no permits for construction thereon had been issued during 1960,1961 and 1962. See finding 30(b).
41. During the period preceding January 11, 1962, most of the new commercial development in the Dover area was on the east side of the city along the main north-south roadway, i.e., Route 13. Older residential and most commercial devel *1260 opment in the Dover area had been concentrated east of the railroad tracks. There was no north-south thoroughfare in the Dover area west of the railroad tracks.
42. During the period 1960-1961, several areas were annexed to the City of Dover. These were (1) the Sherwood and Woodbrook subdivisions located across the Pennsylvania Bailroad tracks to the east of Eden Hill Farm (see finding 32); (2) Northwest Dover Heights; (3) a small portion of vacant land across Hazlettville Boad from the Eden Hill Farm known as the Mifflin Farm, which had been purchased by the City of Dover Housing Authority for low-cost housing (see finding 30(c)); and (4) the remainder of the Mifflin Farm, which was located just north of Eden Hill Farm along Hazlettville Boad and extended approximately one-half mile beyond the Eden Hill Farm to the west.
43. The history of the Dover area indicates that it is an area in which new industry has located only sporadically and after long intervals. Thus, after the Bichardson & Bobbins plant was established in 1880, it was not until 1937 — 57 years later — that International Latex established its first plant in Dover. And it was not until 1951- — 14 years later — that the Coty company established a small plant for use in distributing perfume products. The history of the area also indicates that in only one instance — that involving International Latex — has a major industry in the area established additional plants in the area.
44. Kent County, in which Dover is situated, experienced little increase in population from 1900 to 1950. In 1900, the population of Kent County was 32,762, whereas in 1950 the population was 37,870. The population of Kent County grew from 37,870 in 1950 to 65,651 in 1960, but this increase in population of Kent County from 1950 to 1960 was largely attributable to the reactivation in 1952 of the Dover Air Force Base which is located about two miles southeast of the center of Dover.
45. The population increase attributable to the reactivation of the Dover Air Force Base was of a kind which would stimulate sendee and professional businesses, but not industrial or manufacturing businesses. The type of businesses likely to grow as a result of the reactivation of the Dover Air Force Base would likely be located east of the railroad tracks *1261 and the City of Dover, rather than west of the railroad tracks.
46. Manufacturing employment in Kent County reached a peak in 1952, increasing from 1,578 in 1944 to 5,384 in 1952. During the period 1952 to 1963, employment in manufacturing in Kent County decreased from 5,384 to 4,255; from 1951 to 1961 employment in manufacturing declined by slightly in excess of 1,000. As previously set forth, the principal manufacturing and industrial plants in the Dover are'a are Richardson & Robbins, International Latex and Coty.
47. (a) From 1960 to 1962, residential construction in the City of Dover declined. During the calendar year 1960, there were 49 permits for residential housing construction issued in the City of Dover. For the year 1961, there were 32 such permits issued, and in 1962, there were 35 such permits issued.
(b) As of the time of the decedent’s death, three residential developments were under construction in and around Dover. These were Sherwood and Woodbrook in Dover, 'and Northwest Dover Heights which was outside the city limits and about a mile north of Eden Hill Farm. See finding 40.
48. In the year 1960, the City of Dover issued no building permits for construction with an estimated cost of between $50,000 and $100,000. In the same year, only two building permits were issued for construction with an estimated cost of over $100,000, one being for a Firestone Store and the other for a library building. For the year 1961, permits for construction with an estimated cost of from $50,000 to $100,000 were issued in only one instance, viz., for the construction of an office building. For the calendar year 1961, building permits involving estimated construction costs of over $100,000 were issued for a new Farmers Bank Building, a church, a public school gymnasium and an addition to a hospital. For the year 1962, there was one building permit issued for construction involving estimated costs of between $50,000 and $100,000 and during the same period there were five permits issued for construction with an estimated cost in excess of $100,000. With the exception of one permit issued to General Foods Corporation (see below), none of the above-referenced building permits for the period 1960-1962 were with respect to land situated west of the Pennsylvania Railroad tracks.
49. In November 1961 decedent’s granddaughter, who was living on the Eden Hill Farm at the time, was asked by a *1262 member of the School Board whether the decedent would be interested in selling a 40-acre parcel of the land as a location for a new high school. Apparently, two members of the School Board were in favor of a location west of the Pennsylvania Eailroad tracks for the new school. The Mifflin tract, just across Hazlettville Eoad, was also under consideration. The decedent and her family were of the view that having the new high school located on the Eden Hill Farm would be extremely beneficial from their standpoint since it would make the remainder of the property more advantageous, particularly for housing. Acting on behalf of the decedent, Henry E. Horsey attempted to interest the School Board in buying a 40-acre tract — the total acreage the School Board needed— in three different locations on the farm. The price suggested initially by Mr. Horsey was $3,000 per acre — an amount which he understood the Board was willing to pay for the new school site. (At that time no appraisal had been made of the property.) Mr. Horsey encountered resistance from the School Board because of (1) the location of the farm west of the railroad tracks which would require the school children to traverse the North Street-Hazlettville Eoad grade crossing; and (2) the dilapidated condition of the neighborhood and the type of buildings on the north side of Hazlettville Eoad. In view of this resistance, Mr. Horsey reduced the asking price first to $2,000 an acre, then to $1,500, and subsequently to $1,000 an acre for one parcel. The School Board was not interested, however, for the reasons outlined and made no counter proposal. Eventually, the Board[1] purchased a site for the new school at a price of $5,000 to $6,000 an acre. This site was east of the Pennsylvania Eailroad tracks and north of the city limits.
50. (a) On November 6,1961,15 acres of the Mifflin Farm directly across Hazlettville Eoad from the northeast boundary of the Eden Hill Farm were sold to the Dover Housing Authority at a price of approximately $3,500 per acre. At the time of the purchase the property lacked public utility services. Such services, however, were available at its entire boundary extending along Hazlettville Eoad. This was in contrast to Eden Hill Farm where utility services along Hazlettville Eoad extended over only a small part of the farm’s northeastern boundary.
*1263 (b) At the date of the purchase, 13 acres of the Mifflin Farm were within the city limits while two acres were outside the city limits. Eden Hill Farm, on the other hand, was entirely outside the city limits.
(c) The circumstances surrounding the sale of the Mifflin tract were unusual. The tract was purchased by the Dover Housing Authority for use as a low-cost housing project to relocate Negro families in an area proposed to be torn down for slum clearance. The tract was in the heart of the Negro district and was thus considered the only feasible site for location of the project in view of racial conditions as they existed in Dover in 1961. Although the Dover Housing Authority had the power of eminent domain and thus could have secured the tract for a fair market value, it preferred, apparently for public relations reasons, to pay a higher price than the fair market value, especially since only 15 acres were involved.
51. (a) The land for the new International Latex plant, west of the railroad tracks, was purchased for $1,000 and $Y50.00 per acre in 1954.
(b) The land for the Coty plant, west of the railroad tracks, was purchased for $550.00 per acre in 1951.
(c) The land for the Sherwood residential subdivision, across the Pennsylvania Railroad tracks from and to the east of Eden Hill Farm, was purchased in 1958 at a price of approximately $3,400-$6,100 per acre.
(d) The land for the Rodney Village subdivision, located east of the railroad tracks and approximately one-half mile south of the Sherwood and Woodbrook subdivisions, was purchased for $1,000 per acre in 1955.

Acquisition by General Foods Corporation

52. In early February 1962, the General Foods Corporation (General Foods) decided to build a new plant to consolidate four obsolete plants and retained a consulting firm, the Fantus Company, to look for a suitable site. In late April or early May 1962, the Fantus Company recommended to General Foods several potential sites for its new plant, including the Eden Hill Farm and locations in Baltimore, Maryland, and Philadelphia, Pennsylvania, provided certain important *1264 conditions were fulfilled. Fantus advised General Foods at about this time that an affiliate of Fantus had been previously retained by the Dover, Delaware, Chamber of Commerce to do a study with a view to attracting new industry to Dover.
53. In the latter part of April 1962, the decedent’s devisees who owned the farm were informed by a local realtor that a large, but unnamed, industry was possibly interested in acquiring 100 acres of Eden Hill Farm. After consulting with the realtor, the owners decided that the asking price would be $2,700 per acre.
54. In connection with the establishment of the new plant by General Foods, the officer of General Foods who was given the ultimate responsibility for establishing such a plant was given a budget for such plant, and, as a part thereof, a contemplated cost for land acquisition.
55. Prior to February 7,1962, no person in General Foods made known to any person outside of the company the fact that General Foods was contemplating establishing a plant in the area of Dover, Delaware, and, as of February 7,1962, Dover, Delaware, had not been selected by General Foods as a location for its new plant. ■
56. (a) General Foods, as an undisclosed principal acting through an agent, by an agreement dated May 11, 1962, acquired an option to purchase approximately 112 acres of Eden Hill Farm as a site for a new plant. The option price was $2,700 per acre.
(b) The option agreement gave General Foods a 120-day option and called for a down payment of 10 per cent or approximately $32,000, which the buyer would forfeit if the purchase were not consummated.
57. The $2,700 per acre option price for Eden Hill Farm was within the budgeted land cost established by General Foods.
58. On or about September 10, 1962, General Foods purchased 116 acres of the Eden Hill Farm from decedent’s devisees at a price of $2,700 per acre, or a total price of $313,000. The property was purchased as a site for a plant of the Jell-0 Division of General Foods. Construction of the plant was started in 1962 and the plant was eventually a multi-million dollar facility employing some 1,500 persons. *1265 The plant produces chocolate, gelatin, syrups, and other food products.
59. Before acquiring 116 acres of Eden Hill Farm, General Foods had no appraisal made of the value of Eden Hill Farm for the reason that the stated price seemed reasonable in comparison with the costs of other sites being considered by General Foods. The land cost was relatively insignificant in relation to the cost of the total project, and General Foods was satisfied to rely on the advice of the Fantus Company. The $2,700 per acre price was the first price suggested by the owners.
60. General Foods did not engage in any negotiations with respect to the $2,700 per acre price fixed in the May 11,1962 option agreement.
61. General Foods considered the $2,700 an acre price for 116 acres of Eden Hill Farm as reasonable, particularly when compared with the substantially higher prices asked for sites in large urban areas that were being considered as alternative sites for the location of the new plant.
62. It was worth approximately $100,000 a week to General Foods to have its new plant in production and a delay of several weeks for the purpose of haggling over the per acre price of Eden Hill Farm would have cost General Foods more than the difference in price which might have been saved by negotiating with respect to the price of land. A delay in acquisition of the plant site due to negotiations with respect to price might well have delayed construction of the plant into the winter period, with an attendant increase in construction costs of from $100,000 to $150,000.
63. In May 1962, the Manager of Engineering Design and Construction for General Foods inspected the Eden Hill Farm for the purpose of determining its suitability as a site for the new General Foods plant. At this point, General Foods was advised by the owners that it could have any part of the tract it desired at the same price.
64. (a) As a result of the inspection of Eden Hill Farm by representatives of General Foods, the company determined that the 116 acres of Eden Hill Farm lying at the western side of the property were suitable as a site for the contemplated new plant, but only if certain important conditions, as described below, were fulfilled.
*1266 (b) The site consisted of a rectangular tract of approximately 100 acres located in tbe northwest comer of the farm along Hazlettville Road and the western boundary of the farm, and an adjoining irregularly shaped tract consisting of approximately 16 acres in a strip extending from the southwest corner of the first tract along the western and southern boundaries of the property and the railroad tracks.
65. General Foods preferred the Eden Hill Farm to other locations for the following reasons: (1) the site was an attractive one on which site preparation and construction would not be as expensive as on certain other sites 'being considered; (2) the area had a relatively low wage rate; (3) the city appeared to want industry, and General Foods thought the city would undertake to provide essential services it needed at the Eden Hill Farm location; (4) the site was close to a main highway and close to a rail line; (5) the price of $2,700 per acre appeared reasonable in the light of the prices at which alternative locations under consideration were being offered.
66. Among the conditions which General Foods insisted must be met before it would acquire any part of the Eden Hill Farm as a site for its contemplated new plant were the following:
(a) An arrangement between General Foods, Delaware Power & Light Company and the City of Dover with respect to the supplying of electric power by both Delaware Power & Light and the City of Dover (from its new power plant) to meet the critical needs of General Foods for uninterrupted service. To assure uninterrupted service for the plant, General Foods was insistent that the City of Dover permit Delaware Power & Light to participate in furnishing the electrical power requirements of General Foods. This necessitated extensive negotiations because the site of the proposed plant lay within the area franchised to the City of Dover for rendering of electrical service. These negotiations were difficult because of an atmosphere of ill will between the City of Dover and Delaware Power & Light.
(b) To satisfy General Foods’ requirements the City of Dover, at its expense, had to greatly expand its sewage system and build a 15-inch sewer line over a mile long to the proposed plant site.
*1267 (c) To satisfy General Foods’ requirements tbe City of Dover, at its expense, bad to increase tbe water supply system of tbe city and extend a 12-inch water main to the site of the plant,
(d) As previously set forth (finding 35), at tbe time of decedent’s death, Eden Hill Farm and lands adjacent to and outside tbe City of Dover were not subject to any zoning or building restrictions. General Foods required that the proposed plant site and surrounding areas be made part of tbe City of Dover and be subjected to a new zoning classification to be known as “Kestricted Industrial Park Manufacturing Zone” which, among other things, prohibits residential development. This condition was of importance to General Foods since it intended to use the contemplated plant for the manufacture of food, and certain uses of surrounding-areas might well produce noxious fumes which would cause air pollution and contaminate its food products.
(e) General Foods insisted that there be an agreement with the City of Dover with respect to trash removal from the site of the contemplated plant.
67. It was not until May 15, 1962, that there was the first public announcement to the effect that General Foods was planning to locate a new plant in the Dover, Delaware, area.
68. Following the execution of the May 11, 1962 option agreement, representatives of General Foods, the City of Dover, and the Delaware Power & Light Company proceeded to negotiate with respect to fulfilling the conditions recited in finding 66 (a) above.
69. (a) It was not until September 4, 1962 (nearly four months after the option agreement) that General Foods and the City of Dover reached an agreement (which was embodied in writing) with respect to the steps to be taken to fulfill the conditions set forth in finding 66 above.
(b) The City of Dover was extremely cooperative and was quite willing to provide the utilities and services required by General Foods.
70. (a) The cost to the City of Dover, attributable to the providing of water and sewerage requirements for the General Foods plant site, pursuant to the conditions imposed by General Foods, was in excess of $900,000.
*1268 (b) The City of Dover never asked the sellers of the Eden Trill Farm to bear any part of the cost of the utility extensions out of the proceeds of the sale, nor did the sellers so offer to reimburse the city.
71. Unless the conditions established by General Foods, as set out in finding 66, had been met (none of which had been met at the decedent’s death), General Foods would not have purchased any part of Eden Hill Farm at $2,700 per acre, or at any other price.
72. As a condition precedent for the rezoning of Eden Hill Farm and the surrounding areas in order to meet the conditions of General Foods in this respect, it was necessary that the area be annexed to the City of Dover. (The surrounding areas thus involved extended approximately three-quarters of a mile to the west and one mile to the south of Eden Hill Farm.) To annex the area a vote of the affected property owners was required. The first vote held on the annexation was defeated. The annexation finally was approved and became effective on October 9, 1962. Thereafter the property was rezoned into a new classification known as “Restricted Industrial Park Manufacturing Zone.”
73. It was only after execution of the written agreement of September 4, 1962 set forth in finding 69(a), which contained all the conditions required by General Foods, that General Foods elected on September 5, 1962 to exercise its option and committed itself to acquire 116 acres of Eden Hill Farm.
74. The part of Eden Hill Farm purchased by General Foods had characteristics and attributes — in terms of newly available and committed — for utilities, zoning and city services — that were greatly different from those pertaining to the property at the date of the decedent’s death.
75. Since the date of the decedent’s death, with the exception of the offer which eventuated in the General Foods acquisition of 116 acres of Eden Hill Farm, there have been no offers made to purchase all or any part of the remainder of the Eden Hill Farm.
76. Subsequent to the General Foods’ sale, the owners of the remainder of Eden Hill Farm discussed selling another parcel of the farm to a party who indicated an interest in the possibility of building a sugar refining plant. Nothing *1269 came of the discussions, nor was any offer made for the property. A price of $3,000 per acre was mentioned in these discussions.

Expert testimony

77. (a) At the trial of the case, the only expert witness with respect to the valuation of Eden Hill Farm as of January 11, 1962, was Samuel C. Hanby, who was called by plaintiff. Mr. Hanby was well qualified to express an opinion with respect to the valuation of Eden Hill Farm as of January 11, 1962. He had been employed by the federal government on a number of occasions to express opinions and to make appraisals with respect to the value of real property in the Dover, Delaware, area. Plaintiff also presented as witnesses in connection with the valuation of Eden Hill Farm (1) a professional land surveyor, formerly an Assistant City Engineer for the City of Dover; (2) the Building Inspector for the City of Dover; (3) a professional photographer; (4) the Director of Engineering Design and Construction for General Foods; (5) the Senior Vice President of a large real estate firm specializing in industrial development work; (6) an economist on the faculty of the University of Delaware; and (7) a civil engineer employed by the consulting engineering firm which had been retained by the City of Dover in the period 1961-1962 in connection with the city’s sewerage and water supply systems.
(b) The defendant presented only a single witness, the General Manager of the Distribution Sales Services Division of General Foods who was Operations Manager of the Jell-0 Division of General Foods in 1962.
(c) Pursuant to a pretrial order, defendant submitted a list of witnesses it intended to call at the trial of this action, which list included at least four persons whose business affiliation indicated that they were real estate brokers or appraisers. Defendant did not explain why it failed to call any real estate broker or appraiser as a witness.
78. It was Mr. Hanby’s opinion that the highest and best use of the Eden Hill Farm as of January 11, 1962 was for agricultural purposes and not for industrial, commercial or residential housing purposes. Having thus concluded, Mr. Hanby expressed an opinion as to the fair market value of *1270 Eden Hill Farm based on a comparison with six farm properties that were sold in the Dover area between 1957 and 1962. In comparing the other properties with the subject property, Mr. Hanby took into consideration the following six factors: (a) Environment, or what surrounds the farm; (b) improvements on the farm which include fences, buildings, bams, etc.; (c) distance to Dover and distance to shopping centers, schools, churches; (d) the date of the sale; (e) the size of the farm; and (f) the tillability of the farm or the soil types and the extent of tillable area to nontillable area such as pasture, woods, marshland, etc.
79. The properties upon which Mr. Hanby based his opinion were as follows:
(1) Property No. 1 was a 138-acre farm located three and one-half miles west of Eden Hill Farm and sold in August 1960 at a price of $268.00 per acre. The property was located approximately four miles from the center of Dover and three and one-half miles from the city limits and the city sewer and water systems. Mr. Hanby considered that the improvements on Eden Hill Farm were better than those on that property. (He generally considered that the house on the Eden Hill Farm was better than any of the comparable properties and valued the house alone on the Eden Hill Farm at approximately $25,000.) Mr. Hanby also considered that the Eden Hill Farm was better with respect to tillability and had an “edge” with respect to distance to Dover. He considered that the environment of the comparable property was better than the Eden Hill Farm and that there was not much difference as to the time of the sale.
(2) Property No. 2 was a 200-acre farm which was located one and one-half miles west of Eden Hill Farm on Hazlett-ville Road. This farm sold for $315.00 per acre in December 1957. The property was approximately two miles from the center of Dover and one and one-half miles from the city limits and the city sewer and water systems. Mr. Hanby considered that the enviromnent of the property was somewhat better than the Eden Hill Farm; that the latter had better improvements; that the date of sale of Property No. 2 required an upward adjustment; and that there was not much *1271 difference in -the two properties in respect to distance to Dover and tillalbility.
(3) Property No. 3 was a 204-acre farm located one and one-lialf miles southwest of Eden Hill Farm and was sold in February 1957 at a price of $349.00 per acre. The property was located approximately two miles from the center of Dover and one and one-half miles from the city limits and the city sewer and water systems. Mr. Hanby considered that Eden Hill Farm had a better house; that the date of the sale of Property No. 3 required an upward adjustment; that the comparable property was better as to tillability; and that the factors of environment and size were about the same.
(4) Property No. 4 was a 220-acre farm located approximately four miles northeast of Dover, which was sold in February 1961 at a price of $318.00 per acre. This property was located four and one-half miles from the center of Dover, four miles from the city limits, and three and one-half miles from the city sewer and water systems. Mr. Hanby considered that the Eden Hill Farm was better with respect to improvements and distance to Dover; that the comparable property was better with respect to tillability; that the properties were similar with respect to date of sale and size; and that the particular property had more of a country atmosphere than the Eden Hill Farm property.
(5) Property No. 5 was a 359-acre farm located approximately four miles east of Dover which sold for $350.00 an acre in June 1962. This property was located four miles from the center of Dover, three and one-half miles from the city limits, and three miles from the city sewer and water systems. It was located next to the town of Little Creek which had a population of approximately 300. Mr. Hanby considered that Eden Hill Farm was better as to improvements and distance to Dover, and that the properties were even in other respects.
(6) Property No. 6 was a 67-acre farm located southeast of Dover in the direction of the Dover Air Force Base, which was sold in June 1958 at $224.00 per acre. This property was located two miles from the center of Dover, one and one-half miles from the city limits, and one mile from the city sewer and water systems. The property was situated almost *1272 in a direct arterial highway line with Dover and was located between Dover and the Air Force Base. Mr. Hanby considered that Eden Hill Farm was better as to improvements (the buildings on this comparable property having 'been in a state of abandonment); date of sale and tillability; and that the two properties were even with respect to environment, distance to Dover, and size.
80. On the basis of the foregoing, Mr. Hanby was of the opinion that the fair value of the Eden Hill Farm as of January 11,1962 was $363.00 per acre, or a total of $143,000.
81. Mr. Hanby considered the possible industrial use of the property and concluded, based on a study of the frequency with which industries had come into Dover in the past, that the property might be expected to be purchased for industrial use in four segments of approximately 100 acres each at 17-year intervals. In arriving at this 17-year interval, Mr. Hanby started in 1856 when the Pennsylvania Railroad was built in Dover, and considered the Richardson & Robbins plant in 1880, the first International Latex plant in 1937, the Coty plant in 1951, and the new International Latex plant in 1954. He further considered that since it had been some time since a new industry had located in Dover (the new International Latex plant had been built in 1954), that as of January 1962 it was more likely that the first industry to come into Dover might not be the full 17 years away, but rather only four or five years away. Based on this analysis, together with an assumed industrial price of land of $2,500 per acre and an interest rate of six per cent, which Mr. Hanby considered appropriate for the property, he concluded that sales of the property 5, 22,39 and 56 years in the future when discounted to present value by use of annuity tables would result in a present value as of January 1962 for the property as a potential industrial site of approximately $300,000. Mr. Hanby further considered that because there were other industrial tracts available in Dover, particularly in the northwestern part of town near the new power plant, there was only a 50 percent chance that industry would land on the Eden Hill Farm if it did locate in the Dover area in the future. He, therefore, concluded that someone purchasing the property for its industrial potential would pay approximately $150,000 for it, or nearly the same amount that someone would *1273 pay for the property as a farm. Mr. Hanby was aware that the Dover Chamber of Commerce had engaged the Fantns Company to prepare a report, designed to help Dover bring in industry, and that the report listed the Eden Hill Farm as one of the potential industrial sites in the Dover area. Mr. Hanby also testified that sales of the property in 100-acre lots at 5,22, 39 and 56 years in the future would not substantially affect the remaining acreage for use as a farm.
82. Mr. Hanby went on to state that while he had very seriously considered the industrial use potential of Eden Hill Farm because of the post-death General Foods’ sale, there was in his opinion, as of the date of decedent’s death, only a remote and speculative possibility that Eden Hill Farm would be usable for industrial purposes.
83. In answer to a hypothetical question involving two farms, A and B, both worth about $140,000 as a farm, in which it was assumed that Farm B had a potential industrial value of approximately $150,000 (computed by use of annuity tables similarly to the method Mr. Hanby himself had used in his study), Mr. Hanby testified that Farm B would be worth more, but only the difference between $150,000 and $140,000 (in the hypothetical), rather than the sum of these two amounts. He further testified that because of its potential industrial value the Eden Hill Farm was worth about $350.00 per acre rather than the usual price of farms three, four, five or six miles from Dover, which without the flickering possibility of industrial value would range from a low of $100.00 per acre to a more usual price of $150.00 per acre and in some cases, if they were particularly fertile farms, would sell for $250.00 per acre.
84. With respect to the sales of comparable properties which he used in valuing the Eden Hill Farm, Mr. Hanby testified that he adjusted them to take into consideration the fact that the market generally would recognize the Eden Hill Farm property as a farm but might pay more for it because it did have a speculative potential. Mr. Hanby made no such adjustment to comparable No. 2 which he considered had a possibility of being used for housing; to No. 6, which he considered had the possibility of industrial use of a truck variety; or to comparable No. 3, although the only use he envisioned for that property was as a farm. Mr. Hanby fur *1274 ther testified that he did adjust comparable Nos. 1, 4 and 5, which were all over three miles from the City of Dover for the potential industrial value of the Eden Hill Farm.
85. The commissioner, accompanied by counsel for the parties, viewed the Eden Hill Farm and surrounding areas.

Ultimate findings as to value of Eden Hill Farm

86. (a) As of January 11, 1962, the highest and best use of the Eden Hill Farm was as a farm for agricultural purposes, which had, in addition, a definite but not substantial industrial potential.
(b)As of January 11,1962, there was a reasonable probability that the Eden Hill Farm would be sold for industrial use in segments over a lengthy period of time.
87. As of January 11, 1962, the fair market value of the Eden Hill Farm for agricultural purposes was $143,000.
88. The reasons why the Eden Hill Farm had a definite industrial potential as of January 11, 1962 include the following:
(a) The property was adjacent to the City of Dover and was close to sewer and water lines;
(b) The city had a new power plant under construction;
(c) The property was close to a main highway and its eastern boundary bordered on the railroad tracks;
(d) The wage rate in the area was relatively low;
(e) Dover wanted industry and the Dover Chamber of Commerce had hired a consulting firm to make a study of Dover to be used in attracting industry;
(f) The site was one on which site preparation and construction work would not be unduly expensive;
(g) The site was near medical facilities, housing and schools, as well as commercial services, such as banking, restaurants, and shopping.
89. The reasons why the industrial potential of Eden Hill Farm as of January 11, 1962 was not substantial and why it was reasonably probable, as of that date, that the property would not be sold for industrial use except in segments extending over a lengthy period of time include the following:
(a) The property was outside of the city limits of Dover and was not subject to zoning or building restrictions;
*1275 (b) The property lacked utility facilities necessary for industrial use;
(c) The Dover and Kent County area had experienced slow population growth;
(d) Kent County and the Dover area had experienced only very slow industrial development; during the 110 years preceding the date of decedent’s death, the rate of absorption of land for industrial purposes in the Dover area was .8 of an acre per year;
(e) Dover was located at a considerable distance from centers of population, the nearest metropolitan center being the New Castle-Wilmington area which was some 50 miles away;
(f) The property lacked frontage on main through highways;
(g) The railroad line which extended in a north-south direction and served the economically depressed Delmarva Peninsula had only limited connections to the south, thus requiring the backhauling of commodities to the north;
(h) There was a limited skilled labor force available in the area;
(i) The property was too large for most single industries;
(j) There was no precedent in the history of the Dover area for an acquisition for industrial use of as much as 100 acres in a single transaction.
90. As set forth in finding 86(b), as of January 11, 1962, there was a reasonable probability that the Eden Hill Farm would be sold for industrial use in segments over a lengthy period of time. In this connection, and on the basis of Mr. Hanby’s expert testimony, a reasonable estimate as of January 11,1962 was (i) that industry would come into Dover in 17-year cycles beginning in 1967; and (ii) that the.approximate 400-acre tract comprising the Eden Hill Farm would be sold for industrial use in four segments of approximately 100 acres each over a period of 56 years, with the first sale taking place in 1967; the second, 17 years later in 1984; the third, in the year 2001; and the final sale in the year 2018.
91. As of January 11, 1962, the average going price for industrial land in the Dover area was $2,500 per acre. .
92. On the basis that the foregoing sale of the Eden Hill Farm in segments over the 56-year period would be at a *1276 price of $2,500 per acre (which is reasonable) and applying an interest rate of 6 per cent (which is also reasonable), sales of the property at intervals of 5, 22, 39 and 56 years when discounted to present value by use of annuity tables result in a present value as of January 11, 1962 of approximately $300,000. But there was, at best, only a 50 per cent chance that industry would locate on the Eden Hill Farm site rather than on other sites in the Dover area and thus, the industrial potential value of the Eden Hill Farm as of January 11,1962, was one-half of $300,000, or $150,000. However, each of the four sales at $250,000 would not represent gain; rather, approximately $36,000 of the proceeds of each sale (one-fourth of the farm value of $143,000) would represent a loss of the property for farming. Therefore, the present value of the property for future industrial use (in addition to its farm value) would not be sums of $250,000 but rather would be sums of $214,000 ($250,000 minus $36,000) at the stated intervals in the future discounted to the present. Applying Mr. Hanby’s discount figures of 6 per cent (one dollar in five years would be worth 74 cents today; in 22 years, 27 cents today; in 39 years, 10 cents today; and in 56 years, 3 cents today) the sums of $214,000, at these periods in the future, would discount to $243,960 as of January 11, 1962.[1] Since there was only a 50 per cent chance that industry coming to Dover would locate on the Eden Hill Farm, the net industrial development potential of the Eden Hill Farm as of January 11, 1962 was one-half of $243,960, or the approximate sum of $122,000.
93. As of January 11,1962, the total fair market value of the Eden Hill Farm was $265,000 (or approximately $661.00 per acre), of which amount $143,000 represented the value of the property for agricultural purposes only, and $122,000 the enhancement in value due to potential industrial use.
94. The highest and best use of Eden Hill Farm as of January 11, 1962 was not for commercial purposes (such as a shopping center, a store or gasoline station).
*1277 95. Among tbe reasons why commercial usage was not the highest and best use of Eden Hill Farm as of January 11, 1962 were the following:
(a) The property was located west of the railroad tracks, whereas the growth of residential areas and population had been to the east of the railroad tracks;
(b) The property was not situated on a main thoroughfare entering Dover;
(c) Eden Hill Farm was situated on Hazlettville Road which was a sparsely traveled highway leading into the farm areas west of Dover but not into any town of any size;
(d) The surrounding area contained many substandard slum houses populated by people with low incomes, which condition was not conducive from an economic standpoint to establishment of stores or shopping centers;
(e) The approach to Eden Hill Farm from the center of Dover was over a single railroad grade crossing with no other usable grade crossing within a reasonable distance;
(f) The approach to Eden Hill Farm from the center of Dover was through a slum area of substandard housing.
96. As of January 11, 1962, the highest and best use of Eden Hill Farm was not for residential purposes.
97. The reasons why the highest and best use of Eden Hill Farm as of January 11,1962 was not for residential purposes include the following:
(a) The approach to the property from the center of Dover — which was via North Street — involved use of a single, steep railroad grade crossing;
(b) The only other direct approach to Eden Hill Farm from the center of Dover would be by constructing a railroad overpass or underpass from areas around the Wood-brook and Sherwood developments (since Delaware law prohibits a builder from constructing a grade crossing); the cost of an overpass or underpass would be such as to make residential development economically prohibitive;
(c) The housing along the North Street approach to the property and across Hazlettville road was substandard, although an urban renewal project which had been planned to eliminate the substandard housing along North Street would have been a tremendous help to the development of Eden Hall *1278 Farm bad it been implemented; it was never carried out, however; (see finding 26)
(d) The growth of residential areas in Dover and vicinity has been to the east of the railroad tracks;
(e) There was no history of substantial housing developments being located west of the railroad tracks except for two housing projects (Northwest Dover Heights and Lincoln Park) which were located near particular schools;
(f) As of January 11, 1962, the Dover School Board resisted the location of a new school at Eden Hill Farm and eventually a site east of the railroad tracks was selected; (see finding 49)
(g) As of January 11,1962, there had been, during the recent past, only a very limited number of building permits issued in the City of Dover.
FACTS WITH RESPECT TO REHOBOTH COTTAGE PROPERTY
98. About 1911, the decedent’s husband purchased property at Behoboth Beach, Delaware, consisting of a lot at the ocean front running from New Castle Street to Stockley Street and being approximately half a block in depth. In 1912, the decedent’s husband built at the southerly end of such lot a summer cottage being the property referred to in this proceeding as the Behoboth Cottage.
99. Decedent and her husband had one child, Philippa Bidgely (now Philippa Bidgely Horsey). Philippa Bidgely Horsey — the only child of the decedent — had two children, a son, Henry B. Horsey (the executor of the plaintiff), and a daughter, Philippa Lloyd Horsey (now Mrs. Lloyd Scheller).
100. At the time of the birth of the decedent’s first grandchild, her husband built a second cottage at the northerly end of the ocean-front lot referenced in finding 98 above for the use of his daughter and her family. On the birth of the decedent’s second grandchild, her husband enlarged the cottage.
101. Following the death of the decedent’s husband in 1940, the decedent acquired title to the referenced ocean-front lot and the two cottages on such lot. The decedent conveyed the cottage at the north end of the property and the surrounding land to her daughter shortly after her husband’s death.
*1279 102. The decedent’s husband was an attorney who maintained a law office in Dover. He was blind.
103. The decedent’s husband made extensive use of the Kehoboth Cottage where he was able to walk around unassisted and to enjoy ocean bathing.
104. The decedent, unlike her husband, did not enjoy the Kehoboth Cottage — -preferring to vacation in mountain areas. Following the death of her husband, the decedent made almost no use of the Kehoboth Cottage. The decedent made no substantial improvements to the Kehoboth Cottage after the death of her husband. Following the death of her husband, the decedent lent the Kehoboth Cottage to friends for their use or rented the property. The decedent did not keep accounts with respect to the rentals and expenses associated with the Kehoboth Cottage or take any part in the management of the property but depended on her daughter to do this for her.
105. Shortly after the death of decedent’s husband, the decedent purchased a house in the mountains at Rensselaer-ville, about four miles southeast of Albany, New York, where she spent summers when she was not traveling abroad.
106. The decedent made it a practice to spend two to two and one-half months every other summer traveling in Europe and when not so spending her summer, she would vacation in the Catskill Mountains in New York.
107. In 1951, the decedent gave to her grandson, Henry K. Horsey, three lots near the property on which the Kehoboth Cottage is situated. In 1953, the decedent transferred to her daughter and her two grandchildren an office- building in Dover known as the Parke Building.
108. In the period 1948-1950, the decedent made substantial improvements on the farm house at Eden Hill Farm which was then occupied by her granddaughter and her husband. Such improvements cost from $12,000 to $15,000. See finding 22(a).
109. In 1955, the decedent gave to her grandson and granddaughter her mountain property at Rensselaerville, New York.
110. In 1949, the decedent’s grandson graduated from Harvard College. On that occasion, the decedent paid for all of *1280 his expenses on a trip to Europe, on a part of which she accompanied him.
111. The decedent’s grandson, Henry R. Horsey, was married in April 1954. In February 1955, the first child of the decedent’s grandson was bom; his second child was bom in July of 1956; his third child was bom in May of 1960; and in January of 1962, the fourth and fifth children (being twins) of the decedent’s grandson were bom.
112. The decedent’s grandson and his wife and children made infrequent use of the cottage owned by his mother and father (the decedent’s daughter and son-in-l'aw) during 1959. The infrequency of this use was because the cottage owned by the decedent’s daughter and her husband was comparatively small and was overcrowded when occupied by the decedent’s grandson and his family. This situation was known to the decedent.
113. In 1959, the decedent’s grandson told her that he would like to have the use of her cottage for his family. The decedent was aware of the fact that her cottage, being larger and older than her daughter’s cottage, was more suitable for the use of her grandson and his young, growing family.
114. By deeds, dated, respectively, November 19, 1959, January 14,1960 and January 3,1961, the decedent conveyed to her grandson, Henry R. Horsey, and his wife, one-third interests in the Rehoboth Cottage.
115. Decedent’s grandson (who was at the time a practising attorney familiar with estate planning and federal estate and gift taxes) suggested the gifts to his grandmother, and the Rehoboth Cottage was deeded in three installments to avoid a gift tax on the transfers. As of 1959, decedent had exhausted her lifetime gift tax exemption. A gift tax return was filed in 1960 reporting the 1959 gift.
116. As of 1959, the decedent’s grandson had insufficient assets to enable him to contemplate purchasing the Rehoboth Cottage from his grandmother.
117. Under the terms of decedent’s will, which was executed in September 1958, decedent’s grandson was to receive the Rehoboth Cottage which was the subject of the gifts. Decedent’s grandson was not aware of the terms of decedent’s will until after her death.
*1281 118. Decedent was 89 years of age at the date of lier death and was 87, 87 and 88, respectively, at the dates of the transfers in 1959, 1960 and 1961 of her interest in the Kehoboth Cottage.
119. During the last 15 years of the decedent’s life, she was not hospitalized except for a period of seven or eight days immediately preceding her death.
120. During the last 15 years of her life, the decedent did not complain to her family of ill health or of not feeling well, although she was not the type of person to complain even if something was wrong with her. During this period, she traveled extensively. She traveled to Europe every other summer. In 1959, when she was 86 years old, she traveled to Europe alone.
121. The decedent, during the last 15 years of her life, entertained guests practically every day. She enjoyed having other people in her home and frequently had overnight guests. She enjoyed being a hostess at a large Christmas party every year, including the Christmas of 1961 immediately preceding her death.
122. For 50 years the decedent was the President of the State Archives Commission and from time to time served on other State commissions, including the commission having charge of building the Legislative Hall and the State Portrait Commission. The decedent resigned from the State Archives Commission only a short time before her death.
123. In 1954, the decedent published a history of the Eidgely family which she had written.
124. Decedent’s regular physician, Dr. FranMin It. Everett, described her physical condition as follows:
Mrs. Mabel Eidgely was a patient of mine from January 15, 1957 to time of her death, January 11, 1962.
The diagnosis was hypertensive and arteriosclerotic cardio vascular disease with marked cardiac hypertrophy. She had episodes of cardiac decompensation on J an. 2,1962, she was seen at home with pulmonary congestion and was sent to Kent General Hospital, Dover, Delaware. She was improving, but suffered a cerebral vascular accident and expired, January 11, 1962.
125. Decedent’s death certificate which was signed by Dr. Everett, among others, states: that “immediate cause” of her death was “Cerebral Vase. Hemorrhage”; that the *1282 interval between onset of snob hemorrhage and death was one day; that the hemorrhage causing her death was “Hypertensive and arteriosclerotic”; that the interval between onset of the latter condition and death was “years”; and that the underlying cause of her death was “C.V. Disease.” Dr. Everett also certified in the death certificate that he had attended the deceased from May 1945 to January 11, 1962.
126. Shortly after the initial gift of the first one-third interest in the Rehoboth Cottage (i.e., shortly after November 1959), the decedent wrote to her grandson and in commenting on the transfer of the Rehoboth Cottage stated:
I did poke fun at my very legal correspondent about Rehoboth.
Since I sent the Rehoboth papers to Mr. Fisher I have been snowed in. When the thaw comes I will do what signing is to be done and have everything ready, for Jan. [1st ?]. I will mention one thing in passing. Vic.& Stanley Worden loved the cottage while they enjoyed it. Vic wanted Ethel Leach’s still life in my bedroom. She still does & I have given it to her. It is on the top of the wainscoting in my room — it is just a cup & saucer, etc. Will you bring it up to Dover some day when you go down there. I will give it to her.
Stanley did everything for my husband that an orderly in a hospital could do besides being his friend and physician. I am sure you will want Vic to have the little sketch.
I am waiting till I can go out (?) when (!) — to sign the papers.
It gives me deep delight to have the cottage turned over to you!
Maybe I’ll want some time to make a final visit to it. But at a time not inconvenient to you & Alexandra.
Its satisfying that it is going to be used and enjoyed.
Blessings on the ones who will enjoy it. I remember how Henry & I walked over the Dunes & decided what we wished to buy! — & how I had the Dunes levelled before we even had title. I just could not wait for Charley Cullen to get the proper deeds!
May there be many happy & free vacations there for you and your children.
FARMERS BANK STOCK
127. As of the date of her death, the decedent owned 510 shares of the stock of the Farmers Bank of Delaware. Such *1283 stock was included in the federal estate tax return at a value of $106.00 per share and an aggregate value of $54,060.
128. The price of Farmers Bank of Delaware stock on the date of decedent’s death, as reported in the newspapers, was $115.00 bid, $125.00 asked.
129. On February 17,1962, plaintiff sold 200 shares of the Farmers Bank of Delaware stock which was included in decedent’s estate. Such shares were sold by plaintiff at $115.00 per share.
130. The following sales of Farmers Bank of Delaware stock were made during January and February of 1962:

131. Laird, Bissell & Meeds is a corporation engaged in the business of acting as a securities broker and in purchasing and selling securities. That corporation has, for many years, maintained the best market for bank stocks in Wilmington, Delaware. In January 1962, Laird, Bissell & Meeds dealt in stock of the Farmers Bank of Delaware.
132. The first of the sales of 200 shares on February 26, 1962, referred to in finding 130, was from the decedent’s estate to Laird, Bissell & Meeds. The second sale of 200 shares on February 26, 1962 involved a sale of these identical shares by Laird, Bissell & Meeds to a customer.
133. The plaintiff presented as a witness at the trial of this action Alfred E. Bissell, Chairman of the Board of Laird, Bissell & Meeds, who had been associated with that firm (including its predecessor partnership) for 36 years. Mr. Bissell has been a director of the Farmers Bank for 32 years, and he or his firm has made 90 per cent of the transactions in the stock of that bank.
134. (a) Mr. Bissell stated as his opinion that the 510 shares of stock of Farmers Bank held by the decedent as of the date of her death on January 11, 1962, could not then *1284 have been sold at more than $100.00 per share due to the thinness of the market and the large block of stock involved. Mr. Bissell’s opinion was first formulated in a letter which he had written on Januar j 22,1962.
(b) There were no sales in January or February 1962 at the $100.00 per share price and Mr. Bissell did not explain how he arrived at that particular price.
(c) Mr. Bissell testified that the sale of the 200 shares by decedent’s estate in February 1962 was at or near the going market price at that time.
ultimate EINDINGS OE EACT AS TO UNAGREED ITEMS
135. As of January 11, 1962, the fair market value of the Eden Hill Farm was $265,000.
136. Decedent’s transfers of interests in the Rehoboth Cottage to her grandson and his wife were transfers in contemplation of death.
137. As of January 11, 1962, the fair market value of 510 shares of Farmers Bank of Delaware stock owned by the decedent was $115.00 per share, or a total of $58,650.
Conclusion oe Law
On the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover and judgment is entered to that effect. Computation of the amount of recovery will be determined pursuant to Rule 47 (c).
In accordance with the opinion of the court, a memorandum report of the commissioner and a stipulation of the parties, it was ordered on October 20, 1967, that judgment for the plaintiff be entered for $341,063.15, plus interest thereon according to law.

The opinion, findings of fact and recommended conclusion of law are submitted under tbe order of reference and Rule 57(a).

By stipulation the parties have agreed that the Rehoboth Cottage, if in-cludible in decedent’s gross estate as a gift in contemplation of death, had a value as of the date of death of $25,000. The parties have also resolved by stipulation various additional issues involving other adjustments in the estate tax return that were made by the Internal Revenue Service.

 The record is not clear whether the third International Latex plant along the east side of the railroad tracks was built in 1937 or 1954.

 Land for residential use that lay east of the railroad tracks was far higher in price. For example, the land for the two residential developments adjacent to Eden HiU Farm but east of the railroad tracks was purchased in 1958 for $3,400-$6,100 per acre. Some three years before, land for another residential subdivision located a half-mile south but also east of the tracks was purchased for $1,000 an acre.

 In the preceding period 1960-1961, several areas, as follows, had been annexed to the City of Dover: The residential subdivisions across the railroad tracks to the east of Eden Hill Farm; a residential development to the west of the railroad tracks located about a mile north of the Eden Hill Farm; the 15-acre tract across from the Eden Hill Farm which had been purchased by the City of Dover Housing Authority in November 1961 for use as a low-cost housing project; and additional vacant land north of Eden Hill Farm along Hazlettville Road and extending about one-half mile beyond the farm to the west.

 Plaintiff also presented as witnesses in connection with the valuation of Eden Hill Farm a professional land surveyor who was formerly an Assistant City Engineer for the City of Dover; the Building Inspector for the City of Dover; a professional photographer; the Director of Engineering Design and Construction for General Foods; the senior vice president of a large real estate firm specializing in industrial development work; an economist on the faculty of the university of Delaware; and a civil engineer employed by a consulting engineering firm which had been retained by the City of Dover in the period 1961-1962 in connection with the city’s sewerage and water supply systems. The defendant presented only a single witness, an official of General Foods who was Operations Manager of the Jell-O Division of General Foods in 1962, whose testimony related to the circumstances surrounding his company’s acquisition of 116 acres of the Eden Hill Farm. Pursuant to a pretrial order, defendant submitted a list of witnesses it intended to call at trial, which list included at least four persons whose business affiliation indicated that they were real estate brokers or appraisers. Defendant did not explain why it failed to call any real estate broker or appraiser as a witness. Under these circumstances, defendant’s failure to call any expert witness at trial gives rise to an inference that such witness’ testimony, if produced, would be unfavorable to it. See e.g., Hoffman v. Commissioner, 298 F. 2d 784, 788 (3d Cir. 1962); Paudler v. Paudler, 185 F. 2d 901, 903 (5th Cir. 1950), cert. denied, 341 U.S. 920; II Wigmore, Evidence (3d ed.) §§285-286.

 As the Supreme Court stated tn Olson v. United States, 292 U.S. 246, 257 (1934): “Elements affecting value that depend upon events or combinations of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, should be excluded from consideration, for that would be to allow mere speculation and conjecture to become a guide for the ascertainment of value — a thing to be condemned in business transactions as well as in judicial ascertainment of truth.” See also e.g., United States v. Toronto Navigation Co., 338 U.S. 396, 405-406 (1949); United States v. Whitehurst, 337 F. 2d 765, 771 (4th Cir. 1964).

 Tie calculations are as follows :
$214,000 X .74 = $158,360
214,000 X .27 = 57,780
214,000 X .10 = 21,400
214,000 X .03 = 6,420
$243,960

 Defendant asserts that Mr. Hanby was Incorrect In dividing his result by one-half on the ground that “there was more like a 75 per cent chance that industry would locate on the Eden Hill Farm." It also asserts that the evidence supports a much shorter cycle than Mr. Hanby’s 17-year cycle; and that the Hanby testimony makes no allowance for possible development other than industrial. On this ground, defendant argues that the Hanby testimony does not support a value of less than $250,000 for the development potential of the farm, or a total value — when adding the value of the farm for agricultural purposes— of not less than $400,000, or approximately $1,000 per acre. However, there is no support of any kind in the record for the assertion that the odds in favor of Eden Hill Farm being developed for industrial use as of the end of the intervals mentioned were 3 to 1, or for the further assertion that the cycles for development as industrial property would be shorter than 17 years — indeed, defendant fails to state how much shorter. Not only does the $250,000 figure suggested by defendant thus lack any support in the record, no explanation is given as to how it was reached.

 In the course of his testimony, Mr. Hanby indicated that the value of the Eden Hill Farm as a farm (i.e., $143,000) was approximately the same as its value as a potential industrial site (i.e., $150,000) and that the two figures should not be added together to find the total value of the farm as of the valuation date. See findings 81, 83. In other words, Mr. Hanby discounted the value of the property at its higher use in the future to the present but did not consider that its present value for farm use should be added to its future value for industrial use. The difficulty with this conclusion is that it fails to give any value to the industrial potential of the property or to give any value to the property for its use as a farm in the period before its industrial potential was realized. Obviously, a farm which has a potential to be sold at industrial prices in the future is worth more than a similar farm not having such a potential, and just as obviously, a tract of vacant land that will yield farm income before its industrial potential is realized is worth more than a similar tract of land that cannot be farmed.

 An exception to the rule pertains to tlxe use of offers to sell as admissions against a party to the suit. Thus, if a landowner’s property is condemned and he is contending in the resulting suit with respect to the value of the property that the property has a value for condemnation purposes in excess of $3,000 per acre, evidence that he had offered to sell the land at $3,000 per acre or less at or near the time of taking has probative value as an admission in respect to the maximum value of such property on the date of the offer. See Anno. 7 ALR 2d 781; 20 Am. Jur. Evidence § 375. However, it is obvious that such testimony has no probative value with respect to the minimum value placed upon such property by the owners. By a parity of reasoning, if there is any probative value to Mrs. Ridgely’s per acre offering price of 40 acres of land, it is to prove that she or her advisers did not consider that the land was worth more than $3,000 per acre. This is entirely different than attempting to prove by such testimony that the land was worth $3,000 or more per acre. There is nothing unusual in the owner of property stating an asking price higher than what he expects to receive for the property.

 In non-medical terms, this condition may be described as abnormally high-blood pressure and hardening of the arteries of the blood system and heart, with morbid heart enlargement. See Dorland’s, Medical Dictionary (24th ed.).

Section 20.2035-1 (c) of tie Treasury Regulations is largely based on United States v. Wells and provides: “The phrase ‘in contemplation of death,’ as used in this section, does not have reference to that general expectation of death such as all persons entertain. On the other hand, its meaning is not restricted to an apprehension that death is imminent or near. A transfer “in contemplation of death’ is a disposition of property prompted by the thought of death (although it need not be solely so prompted). A transfer is prompted by the thought of death if (1) made -with the purpose of avoiding death taxes, (2) made as a substitute for a testamentary disposition of the property, or (3) made for any other motive associated with death. The bodily and mental condition of the decedent and all other attendant facts and circumstances are to be scrutinized in order to determine whether or not such thought prompted the disposition.”

 There are a number of cases, on the other hand, where transfers by elderly persons were found not in contemplation of death, because the motive inducing the transfer was one associated with life. Lowndes & Kramer, id. p. 72 and note 82.

 There were no sales In January or February 1962 at the $100.00 per share price, and Mr. Bissell presented no explanation or analysis of how he arrived at that particular price. His opinion was originally set forth in a letter dated January 22, 1962, but apparently plaintiff did not fully accept that opinion since it reported the stock for estate tax purposes at $106.00 per share.

 $214,000 X .74 = $158,360
214,000 X .27 = 57,780
214,000 X .10 =' 21,400
214,000 X .03 = 6,420
$243,960