Estate of Lewis W. Barton, John J. Glavin, Co-executor and Ernest A. Kopp, Co-executor v. Commissioner.
Estate of Barton v. Commissioner
Docket No. 1622-69.
United States Tax Court
T.C. Memo 1972-30; 1972 Tax Ct. Memo LEXIS 225; 31 T.C.M. (CCH) 116; T.C.M. (RIA) 72030; February 8, 1972, Filed Sidney D. Rosoff and Stephen Golding for the petitioner. Rudolph J. Korbel, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in the Federal estate tax of the Estate of Lewis W. Barton in the amount of $39,435.27. Certain issues have been disposed of by the parties, leaving for our decision whether the transfer by the decedent during 1962 of insurance *226 policies on his life to an inter vivos trust created by him for the benefit of his sons was made in contemplation of death so that the $74,070.69 life insurance proceeds received by the trustees are includable in decedent's gross estate under section 2035, I.R.C. 1954. [1]
Findings of Fact Some of the facts have been stipulated and are found accordingly. John J. Glavin and Ernest A. Kopp, both of whom resided in Albany, New York at the time the petition in this case was filed, are the individual coexecutors of the Estate of Lewis W. Barton. Lewis W. Barton (decedent) died testate on April 22, 1964, after an illness of several days. A Federal estate tax return for the Estate of Lewis W. Barton was filed with the district director of internal revenue at Albany, New York, reporting a total gross estate of $379,882.44 and deductions of $51,309.33. Included in the gross estate as reported were stocks and bonds valued at $210,469.81 and mortgages, notes, and cash valued at $118,469.11. Decedent was born on November 5, 1913. In 1941 he married Helen Leary (Helen). They had two sons, Thomas born May 24, 1942, and Paul *227 born February 10, 1948. Decedent was a physician who practiced as an otolaryngologist (ear, nose and throat specialist). His practice in his specialty was the largest in Albany County, New York. Decedent's gross income from his medical practice was $91,619 in 1961 and $90,085 in 1962. Decedent was sincere, quick thinking, and possessed of good judgment. He was good natured and an easy person with whom to work. Decedent was not a procrastinator. He made quick and correct judgments in his practice and it was this trait that enabled him to maintain his busy schedule. In the normal course of an office day he would see 35 or more patients. Decedent was interested in the ship "Hope" (The People to People Health Foundation, Inc.) and impressed by the action of those physicians who contributed 2 months of their time to work with other physicians in the countries where the ship was operating. Despite his own very active practice, in March of 1962 decedent volunteered to serve on the ship "Hope" in Peru for 2 months during the summer of 1962. He 117 arranged to serve from July 8 through September 2 of that year. He was to work with doctors in his own specialty with whom he would *228 open clinics. He considered that his work would help improve the medical services in Peru and contribute to the Hope Program. In order to serve in July and August, 1962 on the "Hope" decedent had to close his practice for the 2 months that he would be away. He arranged his affairs so that during his absence in July and August 1962, another physician would cover for him when it was necessary. He arranged for his secretary to book appointments during the summer to start upon his return in September. On June 23, 1962, shortly prior to decedent's scheduled departure for service on the "Hope", his wife, Helen, died suddenly of an acute coronary and cardiac arrest. Decedent had been engaged as the otolaryngologist for the July-August tour of duty on the "Hope" and on short notice it was not practical to replace a doctor in this specialty. Not only were decedent's professional services needed on the "Hope" but he was to establish a department of nose and throat medicine in the local medical school in Peru. Decedent, after his wife's death, stated to his friends that he did not believe that he could serve on the "Hope" for the months of July and August and leave his two sons in Albany *229 alone. Decedent's friends encouraged him to make some arrangements to follow through with his commitment to serve on the "Hope," stating to him that the change would be good for him. On the suggestion of his friends, decedent explained his problems to officials of the Hope Program in Washington, D.C., and was advised to come to Peru as he had planned and to bring his sons with him. Decedent immediately made up his mind to go to Peru to serve on the "Hope" and to take his sons with him. Even though the arrangements for his sons to accompany him had to be completed in a very short time, decedent wanted to complete arrangements for the administration of his wife's estate before he left for Peru. Immediately upon deciding to go to Peru as he had planned, he contacted his friend and attorney, John J. Glavin (one of the executors of his estate) and engaged Glavin to complete the administration of his wife's estate. Helen had died intestate and decedent wanted Glavin to have him appointed as administrator before he left for Peru and have any restrictions that might exist on his use of funds in joint bank accounts or bank accounts in Helen's name removed. On July 6, 1962, Letters of Administration *230 of Helen's estate were granted to decedent. Helen's estate did not exceed the estate tax exemption and there was no Federal estate tax liability thereon. Decedent in July 1957 had made gifts of securities to his two sons by having the securities placed in his wife's name as custodian for the children. Glavin instituted proceedings in the Surrogate's Court to have Ernest A. Kopp, a doctor who shared offices with decedent, made custodian in her place. At the time of the proceeding in the Surrogate's Court, these gifts were valued at about $11,000 per child. During conversations relating to the administration of Helen's estate, decedent and Glavin discussed the problem of guardians or trusteeships for his children and the disposition of whatever assets he had for the best protection of his children. Glavin asked whether Helen had owned any life insurance policies. Decedent stated that she had no life insurance but volunteered the information that he did have insurance on his own life which he had purchased for her benefit which he planned to surrender for its cash value. Decedent told Glavin that he did not wish to continue to pay the premiums which amounted to between $2,000 and *231 $3,000 per year on the insurance since he no longer needed to carry insurance for Helen's benefit. Decendent told Glavin that he was going to cash in the policies and invest the money in the stock market. He stated that he thought that he could make far more money by investing in the stock market than by investing in insurance. Glavin advised decedent that in his judgment it was a serious error to dispose of a very safe asset such as insurance and divert the funds to speculative investments. Glavin told decedent that he thought it especially inadvisable to dispose of life insurance under his emotional stress resulting from Helen's recent death. Decedent told Glavin that he wanted his financial affairs settled before he departed for Peru only a few days hence, and that he had no choice with respect to the insurance because he did not want the proceeds to go to his children at their present ages. Glavin suggested that decedent could create a trust for the benefit of Thomas and Paul with the insurance policies as its corpus and that he, Glavin, as co-trustee, could determine 118 after investigation what should be done with respect to the policies. On July 6, 1962, such a trust *232 was created for the benefit of Thomas and Paul, John J. Glavin and Matthew G. Leary, Helen's brother, being the co-trustees. The corpus of this trust consisted of life insurance policies on decedent's life with a face value of $73,588 and a cash surrender value of $24,057. Schedule A attached to the Declaration of Trust and made a part thereof listed the following as the assets transferred to the trustees: No. of
Face
Name of company
policy
value
National Service Life Ins.
V. 2207943
$10,000
Prudential Ins. Co. of America
17229702
10,000
Prudential Ins. Co. of America
17376089
30,000
National Life Ins. Co.
773083
10,000
New England Mut. Life Ins. Co.
968818
1,000
New England Mut. Life Ins. Co.
968817
1,000
New England Mut. Life Ins. Co.
1129919
3,000
Mass. Mutual Life Ins. Co.
GI 4848
8,588
cert. No. 34
at age 48
Under the terms of the trust, the corpus was not to be distributed to the boys until each reached the age of 30, except as the trustees in their sole discretion should determine necessary for the maintenance, welfare, or education of the beneficiaries. The trustees could accumulate income until the boys were 21 years *233 of age. Thereafter, income would be distributed until the trust terminated as to each boy when he reached age 30. The trust was irrevocable and not subject to alteration by the grantor, the decedent. The instrument specified that "Neither the creation of this Trust nor any distribution of income or principal hereof shall be deemed or considered to discharge or relieve the Trustor from his obligation to support his sons, Thomas Lewis Barton and Paul Willard Barton." Paragraph 8(X) stated in part as follows: (X) The Trustee as absolute and unqualified owner of Life Insurance Policies on the Life of the Trustor shall have vested in him any and all title, rights, and interest, and all incidents of ownership including for example but not limited to the right to name beneficiaries, change beneficiaries, pay premiums, elect one or more options and make changes in such elections, surrender the Policies or select extended Insurance or paid up Insurance, and any and all other acts which might be done by the owner of or the insured of any Life Insurance Policy. The Trustee is authorized to apply the dividends upon the Policies, or to borrow thereon, or to exercise any of the rights thereunder *234 for the payment of the premiums on said Policies. Upon the death of the Trustor the Trustee shall collect the proceeds of said Policies and shall apply the same in conformance with its duties as Trustee. One day prior to the creation of the aforementioned trust, decedent executed his last will and testament. This instrument creates a testamentary trust for the benefit of decedent's sons, the corpus of which would be all the decedent's estate save for some minor specific gifts and a specific legacy in trust to Paul for his education and support until age 21. This testamentary trust provided for distribution of the corpus to the beneficiaries when Paul reached 30 unless he died before that age, in which event distribution was to be made when the older son, Thomas, became 30. In creating the special trust for Paul, the will stated: * * * In the event that I should die before my son, Paul Willard Barton, reaches the age of twenty-one (21) years, I wish to provide support for him until that age; my older son has received his support and education while he was growing up, and I wish my younger son to be similarly favored, * * * * * * After he has reached his twenty-first birthday *235 I feel that he may be able to be self-supporting; and in any event he will have his share of my Residuary Estate, if my Executors or Trustees should feel that he has any extra needs. Decedent was concerned about the schooling and the future security of his sons. His older son, Thomas, a student at Yale, had left school for a time in order to work on an oil barge in the bayous of Louisiana. Decedent tried unsuccessfully to persuade Thomas to reconsider but after his mother died, Thomas did return to college. The younger son, Paul, was only 14 when his mother died. At the time of the creation and execution of his will and the insurance trust, decedent's health was good and decedent, though saddened by his wife's recent death, was generally in good spirits and was enthusiastically anticipating his service on the "Hope". Decedent informed his attorney, Glavin that he thought keeping the life 119 insurance policies in force rather than investing their cash surrender value was foolish because decedent believed he would not die before the insurance policies expired. The will which decedent had prior to executing a new will on July 5, 1962, had also been drafted by Glavin. That will *236 primarily provided for Helen if decedent predeceased her. Decedent wanted the new will to contain specific trust provisions for the benefit of his two children with provisions to protect both the income and principal of the trust. Glavin, as trustee, corresponded with the insurance companies which issued the policies forming the corpus of the trust created by decedent on July 6, 1962, to determine the action he considered advisable to be taken with respect to the policies. Glavin, acting as trustee, converted the two Prudential policies to extended term, providing $40,000 in coverage until 1986 and then $10,000 in coverage until 1993. The National Life Insurance Co. policy was changed to paid-up participating life insurance for a reduced amount of $8,463. The two $1,000 life insurance policies issued by New England Mutual Life Insurance Company were changed to paid-up policies with a reduced value of $870 each. The $3,000 life policy from the same company was to be converted to paid-up insurance of a value of $2,546, effective August 4, 1964, but the insured died prior to that date. Glavin did not consult with decedent prior to converting these policies. Decedent told Glavin *237 that the responsibility with respect to the policies was Glavin's only and he (decedent) did not want to be consulted about them. No premiums were paid on the policies after they were placed in trust for the benefit of decedent's children. None of the policies was cashed in. The National Service Life Policy was stated in the trust instrument to be transferred to the trust but after decedent's death, Glavin determined that in his opinion all incidents of ownership in that policy were not transferable. On Friday, April 18, 1964, decedent complained to his medical secretary Dorothy Layman, that he did not feel well and that he would have to leave his office early. He did leave about 4:30 p.m./ after having seen about 28 patients. On Saturday, he entered St. Peter's Hospital in Albany and on Tuesday, April 22, 1964, decedent died. The cause of death was staphylococcal septicemia. No value for the insurance policies transferred to the trust created on July 6, 1962, or for the proceeds of these policies was included in the gross estate as reported on the return filed for the estate. Respondent in his notice of deficiency increased the gross estate as reported by the $74,070.69 *238 proceeds of the life insurance policies transferred to the trust with the explanation that it is determined that the transfers by decedent of these policies in 1962 to an inter vivos trust created for the benefit of his sons were made in contemplation of death. Opinion Section 2035[2] provides for the inclusion in a decedent's gross estate of the value of property transferred (except by sale for adequate and full consideration) in contemplation of death. This section states that transfers made within 3 years of a decedent's death, unless shown to the contrary, shall be deemed to be in contemplation of death. *239 Section 20.2035-1(c), Estate Tax Regs., defines "in contemplation of death" as follows: (c) Definition. The phrase "in contemplation of death," as used in this section, does not have reference to that general expectation of death such as all persons entertain. On the other hand, its meaning is not restricted to an apprehension that death is imminent or near. A transfer "in contemplation of death" is a disposition of 120 property prompted by the thought of death (although it need not be solely so prompted). A transfer is prompted by the thought of death if (1) made with the purpose of avoiding death taxes, (2) made as a substitute for a testamentary disposition of the property, or (3) made for any other motive associated with death. The bodily and mental condition of the decedent and all other attendant facts and circumstances are to be scrutinized in order to determine whether or not such thought prompted the disposition. Petitioner contends that the "bodily and mental condition of the decedent and all other attendant facts and circumstances" make clear that motives associated with life rather than death prompted the transfer by decedent of the life insurance policies to *240 the trust. Respondent argues that the facts in this case clearly show a death related motivation for the transfer. We stated in Estate of Robert W. Hite, Sr., 49 T.C. 580, 597 (1968), that this Court must make the essentially factual determination of whether life or death motives were controlling, impelling, or dominant. Allen v. Trust Co. of Georgia, 326 U.S. 630, 636 (1946). The Supreme Court in United States v. Wells, 283 U.S. 102 (1931), has set forth the classic definitional statement on the meaning of the statutory phrase, "in contemplation of death." It is incumbent upon us to ascertain the dominant motive prompting the gift. The purpose of the statute and its predecessors is to reach substitutes for testamentary dispositions in order to prevent evasion of the estate tax. * * * Respondent, in support of his argument that decedent's motives in establishing the insurance trusts were death related, places great weight on the nearly simultaneous execution of the decedent's will on July 5, 1962, and the creation of the inter vivos trust on July 6, 1962, both having the decedent's sons as the recipients of decedent's estate and both *241 creating trusts with similar provisions. There are a number of cases which hold that the simultaneous execution of a will and the making of an inter vivos gift for the same beneficiaries are an indication that the inter vivos gift is in the nature of a testamentary disposition. See Estate of Robert H. Hite, Sr., supra; Commissioner v. Gidwitz' Estate, 196 F. 2d 813 (C.A. 7, 1952), affirming 14 T.C. 1263 (1950); and Estate of Mabel Lloyd Ridgely v. United States, 180 Ct. Cl. 1220 (1967). However, each of these cases had numerous facts indicating a testamentary disposition in addition to the closeness of time between the execution of the will and the gift with the beneficiaries the same. In two of these cases the donor at the time of the gift was in his eighties and in ill health. In the other the donor was in his seventies at the time of the gift and there were other facts indicating the testamentary nature of the gift. Respondent also argues that the nature of the trust corpus, life insurance policies, is indicative of a death related motive in creation of the trust. Respondent states that the fact that the trust was created shortly *242 after the unexpected death of decedent's wife, Helen, is indicative of its creation being testamentary in nature, particularly in view of the relative economic security enjoyed by decedent's sons as long as decedent lived. Petitioner asserts that the fact that decedent was in good health at the time of the transfer, was 48 years old and very energetic, indicates that the transfer to the trust was not death motivated. Petitioner contends that the simultaneous execution of the will and trust in this case was not occasioned by decedent's desire to establish an integrated testamentary scheme but because he had but 20 days following his wife's death to change his will and make any other financial arrangements he felt were needed following her death before he left for Peru. His prior will had been written with the expectancy that Helen would survive him and he felt the will needed to be changed after her death. The idea of an inter vivos trust was instigated not by decedent but decedent's attorney who was aware that decedent would be out of the country for 2 months. Petitioner contends that an ordinary life insurance policy is a valuable asset independent of its insurance features *243 and that decedent viewed the policies as any other cash asset. To decedent the insurance policies represented some $24,000 in cash surrender value which could be used as an investment whereas between $2,000 and $3,000 per year in premiums was required to keep the insurance in force. Decedent did not consider insurance as a good investment and did not intend to and in fact did 121 not continue to pay the premiums on the insurance policies. The evidence shows that the policies were originally purchased for Helen's protection and that in decedent's view, he did not need the insurance after her death. Although decedent's younger son, Paul, was only 14 years old, decedent's will created a specific trust fund for his education until he reached age 21. Decedent expressed in his will the thought that after Paul reached his twenty-first birthday he would be able to be self supporting. The decedent's older son, Thomas, was almost 21 and had already received the benefit of several years of education at Yale. Decedent's intention was to surrender the policies and invest the funds in the stock market where he could "make himself a lot more money than he could by investing it in insurance. *244 " Upon the creation of the trust, decedent relinquished all incidents of ownership in the policies [3] and retained no rights or powers in the management of the trust. Of particular importance is the fact that decedent made no further premium payments. The trust created by decedent was entirely unfunded. The trustee was under absolutely no obligation to keep any of the insurance in force but could if he deemed such action advisable surrender the policies for cash and invest the proceeds as he saw fit. These proceeds could, if the trustee deemed such action advisable, have been invested in securities or other income-producing property. The parties disagree on whether decedent created the trust with the intention of protecting his sons' economic future following his death or created it to provide a reserve in the form of the insurance cash value, more or less as a hedge against possible reverses in the stock market. In our view which of these reasons for creating the trust was decedent's dominant motive is basically the ultimate determination we are required to make in this case. Considering all the *245 facts in this record we conclude that decedent's dominant motive in creating the trust was connected with life and not death. Decedent was a man of 48 and in good health. He had sufficient assets other than insurance to have his sons more than adequately cared for in the event of his death until they were self supporting. He did not consider that he needed insurance protection for his sons but did consider the $24,000 cash surrender value of the policy as the equivalent of cash. He did not intend to continue paying premiums on the policies and in fact established a nonfunded insurance trust and paid no premiums himself on the policies after the trust was established. He did not suggest to the trustee that he keep the policies in force but rather gave him full liberty to sell them. In fact he suggested to the trustee when creation of the trust was being discussed that he (the trustee) cash the policies in and invest the cash for the trust. The trustee never asked for any advice from decedent after the trust was created, but was of the opinion that had he asked, decedent would urge him to surrender the policies and invest the cash proceeds in other assets. Under the facts here present *246 we do not consider that the creation of the inter vivos trust simultaneously with the making of a new will is significant. In our view the only significance to the corpus of the trust being insurance policies in light of all the facts here present is that decedent was persuaded by his attorney that these policies were a very safe and conservative investment worth $24,000 cash which he should give to his sons to provide them some independent means when they became 30 or if needed before that date. This record amply supports the conclusion that decedent did not contemplate his death occurring before his youngest son reached 30 and by that time his sons would own outright the corpus of the trust. Even though when the corpus of a trust is insurance policies, there must necessarily be to some extent a contemplation of the fact that the death of the trustor will at some time occur, where the evidence establishes that the dominant motive in establishing the trust is connected with life and not death, such a trust is not a transfer in contemplation of death under section 2035 and section 20.2035-1(c), Estate Tax Reg. Estate of Louis Richards, 20 T.C. 904, 913 (1953), affirmed *247 per curiam on another issue 221 F. 2d 808(C.A. 9, 1955). The trustee of the inter vivos trust created by decedent, in his testimony at the trial of this case, expressed an opinion to the general effect that it was questionable whether the assignment to the trust of the National Service Life Insurance policy was valid under the laws relating to such policies. He stated that he had not been aware at the time the trust was created of any 122 restrictions on assignment of such policies. In this case the parties stipulated that the corpus of the trust created by decedent on July 6, 1962, "consisted of life insurance policies on Dr. Barton's life with a face value of $73,588.00 and a cash surrender value of $24,057.00." The insurance policies listed in the schedule attached to the trust instrument totaling the face value and cash surrender value to which the parties stipulated included a National Service Life Insurance policy of a face value of $10,000. Neither when this testimony of the trustee as to his opinion of the assignment of the National Service Life Insurance policy was given nor at any other time including brief and reply brief has respondent requested to be *248 relieved of his stipulation respecting the assignment of this policy or to have the question of whether decedent had incidents of ownership in the National Service Life Insurance policy at the date of his death considered. We recognize that we are not bound by a stipulation of the parties which is, as here, a conclusion of law. We also recognize that there are provisions of the United States Code and the Code of Federal Regulations which suggest that all incidents of ownership in a National Service Life Insurance policy cannot be assigned. However, in our view, since this issue is not raised by the parties, we should not consider it, and we merely note the problem so that it will be clear that we are not in this case concluding as a matter of law whether a valid assignment can be made of a National Service Life Insurance policy so as to remove from the insured all incidents of ownership. We will leave the decision of that issue until it is properly presented. We had occasion to consider, upon proper presentation of the issue, certain protection of the rights of an insured under a National Service Life Insurance policy contained in the applicable statute. See Estate of Hugh C. Hutson, 49 T.C. 495, 499 (1968), *249 in which we held the proceeds of such a policy to be includable in full in a decedent's gross estate as his separate property even though decedent's other property was community property under the laws of California and his debts were community debts. We hold that decedent's transfer of the insurance policies to the trust was not in contemplation of death and that respondent erred in including the proceeds of these policies in decedent's gross estate. However, because some of the issues have been disposed of by agreement of the parties, Decision will be entered under Rule 50. Footnotes
1. All references are to the Internal Revenue Code of 1954.↩
2. SEC. 2035. TRANSACTIONS IN CONTEMPLATION OF DEATH. (a) General Rule. - The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, in contemplation of his death. (b) Application of General Rule. - If the decedent within a period of 3 years ending with the date of his death (except in case of a bona fide sale for an adequate and full consideration in money or money's worth) transferred an interest in property, relinquished a power, or exercised or released a general power of appointment, such transfer, relinquishment, exercise or release shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this section and sections 2038 and 2041 (relating to revocable transfers and powers of appointment) but no such transfer, relinquishment, exercise, or release made before such 3-year period shall be treated as having been made in contemplation of death.↩
3. Except the National Service Life Insurance policy hereinafter discussed.↩